Lester R. NELSON, L. Boerebach, C. H. Bunkholt, Gunnar Peterson, E. H. Everetts, Ralph Hallberg, Harry Burns and Vern Thomay, Petitioners,

v.

Alfred JOHNSON and Robert J. Jensen, Respondents.

No. 4-61-Civ. 280.

United States District Court
D. Minnesota,
Fourth Division.

Dec. 21, 1962.

As Amended Jan. 11, 1963.

James C. O'Neill, and Bundlie, Kelley & Torrison, St. Paul, Minn., for petitioners.

Francis X. Helgesen, and Helgesen, Kane, Peterson & Engberg, Minneapolis, Minn., for respondents.

LARSON, District Judge.

Petitioners ask this Court to amend its Findings of Fact, Conclusions of Law and Order for Judgment filed July 31, 1962.

The Court has considered the arguments and briefs of counsel.

Two prior Orders have been filed in this case, one on April 13, 1962, and one on July 31, 1962. These Orders are hereby withdrawn and set aside and the following Findings and Conclusions substituted as the final decision of this Court in this case.

This is an action by eight members of Local 386 of the Brotherhood of Painters, Decorators and Paperhangers of America, AFL-CIO, as Petitioners against the Respondents Alfred Johnson, President, and Robert J. Jensen, Treasurer of the Union, under Sections 501(a) and (b) of the Labor Management Reporting and Disclosure Act of 1959, 73 Stat. 535, 29 U.S.C. 501(a) and (b), commonly known as the Landrum-Griffin Act.[1] Several Pe-

---

1. "(a) The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy.

"(b) When any officer, agent, shop steward, or representative of any labor organization is alleged to have violated the duties declared in subsection (a) of this section and the labor organization or its governing board or officers refuse or fail

titioners are also officers of the Union. The Petitioners claim that under Section 501(a) the Respondents are in positions of trust with respect to the Union, and that as officers they have certain duties which they have violated. Specifically, Petitioners claim that Respondents have violated the following provisions of 501(a) in that they:

1. failed to hold the money and property of said local union solely for the benefit of the organization and its members;

2. failed to expend the same in accordance with the union constitution and by-laws and resolutions of the membership thereof;

3. failed to refrain from dealing with said Union as an adverse party in any matter connected with their duties; and

4. failed to refrain from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization.

Petitioners claim that Respondents have refused to sign checks in payment of certain bills which have been approved by the membership of the Union. The most substantial item ($3,475.00) is a claim for reimbursement for fees for services paid to attorneys in what will be referred to later as the first federal court action. In addition, four of the Petitioners ask for reimbursement of expenses totaling $263.44.

Petitioners ask that this Court grant an injunction directing Respondents to execute checks in payment of these bills and that the Court declare that the Respondents did not comply with the requirements of Section 501(a) in the manner stated above.

■ In their answer Respondents allege in part that the Court lacks jurisdiction over the subject matter of the action.[2] The remainder of their answer essentially denies the Petitioners' allegations.

## FINDINGS OF FACT

1. The Petitioners are members of Local No. 386 of the Brotherhood of Painters, Decorators and Paperhangers of America, AFL-CIO. Petitioner Burns is the vice president of the Local. Petitioners Everetts and Thomay are trustees. Petitioner Hallberg is a member of the Executive Board.

2. Respondents are respectively president and treasurer of the Local Union.

3. The Local Union has approximately 2,200 members. Seven members constitute a quorum for meetings. The International Constitution and the Local By-Laws require that all bills must be approved first by the trustees and then by the membership of the Local Union before payment. Respondents have the duty, as president and treasurer of the Local, to sign checks in payment of bills thus approved. They have refused to sign checks so approved which were to be paid to some of the Petitioners as re-

---

to sue or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any member of the labor organization, such member may sue such officer, agent, shop steward, or representative in any district court of the United States or in any State court of competent jurisdiction to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization. No such proceeding shall be brought except upon leave of the court obtained upon verified application and for good cause shown, which application may be made ex parte. The trial judge may allot a reasonable part of the recovery in any action under this subsection to pay the fees of counsel prosecuting the suit at the instance of the member of the labor organization and to compensate such member for any expenses necessarily paid or incurred by him in connection with the litigation."

2. This position is not well-founded. Federal jurisdiction was conferred when the petitioners clearly alleged the violation of a federal right. Louisville & Nashville R. R. v. Mottley, 211 U.S. 149, 152, 29 S. Ct. 42, 53 L.Ed. 126 (1908); Addison v. Grand Lodge of Int'l Ass'n of Machinists, 300 F.2d 863 (9th Cir., 1962); 1A Moore's Federal Practice 472 (1961).

imbursement for expenses and attorneys' fees incurred by them in setting aside certain decisions of the Local Union Trial Board.

4. Prior to May 16, 1960, there were strong differences of opinion within the Local concerning wage negotiations which were being conducted by various incumbent officers. Petitioners and other union members held various meetings at their homes for the purpose of selecting an opposition slate of candidates to run against Respondents and other incumbent Local Union officers.

5. At the nomination meeting of May 16, 1960, before Petitioners had nominated their opposition candidates, the incumbent business agent of the Local, Carlson, preferred charges against twelve union members (most of them were opposition candidates), including six Petitioners herein, alleging violations of numerous union principles.

6. On June 14, 1960, a special meeting of the Local Union was had for the purpose of determining the reason for and nature of the charges brought against Petitioners and other opposition candidates. At this meeting the charging party, Carlson, the incumbent business agent, with the assistance of the representative of the International Union, Petersdorf, read from an affidavit which accused some of the charged union members of being Communists, and when asked to specify names, replied that all those charged were equally guilty. During this meeting Respondent Johnson unduly interrogated the signers of the petition for the special meeting, and Respondent Jensen twice moved to adjourn the meeting before it had been completed. The business agent was instructed by the membership to withdraw his charges. He refused to do so.

7. Petitioners and other members charged requested the International's president, in late June, 1960, to take jurisdiction over their trials, stating their belief that they would not receive a fair trial from the Local's Trial Board, which was composed of incumbent officers and business agents. The International President refused to do so by letter dated July 7, 1960, expressly pointing out to Petitioners that they had a right to appeal any adverse determinations to the International Union.

8. The first series of union trials were had for the charges filed against Petitioners and others in July, 1960. Respondent Johnson, as president of the local union, was chairman of the Trial Board. Four of the five Trial Board members were Johnson, two incumbent assistant business agents, and a Johnson appointee who took the place of a Trial Board member who had also been charged. The first three union members tried were tried in accordance with the trial procedures set forth in the Union Constitution and they were acquitted. Thereafter the Trial Board changed the trial procedures; the accused were denied the right to have another accused union member act either as counsel or as witness and were presumed to be guilty instead of innocent of the charges, all in violation of the Union Constitution. All of the remaining charged union members were then found guilty and were either fined or suspended. Respondent Jensen acted as a witness for the charging party, Carlson, the incumbent business agent, in all trials held after the trial procedures were changed. The Trial Board had secretly met with the charging party, Carlson, before the trials to consider his evidence and had resolved that a constant vigil of the charged union members should be had pending trial. Respondents further admitted in engaging in surveillance of Petitioner Nelson's house earlier in the year, accompanied by the charging party, Carlson, his two assistant business agents (members of the Trial Board) and others.

9. Petitioners appealed to the International Union for relief from the adverse determinations of the Local Trial Board. Despite the obvious violations by the Trial Board of the trial procedures and rights of Petitioners as set forth in the Union Constitution, the International Union in October, 1960, affirmed the unlawful action of the Local Trial Board.

10. In December, 1960, Petitioners and others brought an action in this Court (4–60–Civ. 344) charging Respondents and others with violation of sections 101(a) (2) and (5) of the L.M.R.D.A., 29 U.S.C. 411(a) (2) and (5) and sought to set aside the improper disciplinary awards. After the Court had issued a temporary injunction against Respondents therein, when the case came on for trial on the merits the parties thereto entered into a stipulation, approved and adjudged binding by the Court, whereby the decisions of guilt made by the Trial Board and the penalties imposed thereby were set aside and withdrawn. Petitioners incurred attorneys' costs of $3,475 in that action and other expenses and costs totaling $262.44 in the first Union trials.

11. On February 6, 1961, the membership of the Union approved (by approximately a 32 to 13 vote) the payment of the Petitioners' attorneys' fees in the first federal court action. The membership of the Union also approved for payment the bill for the attorneys' fees of Respondents and other defendants in the first federal court action. The incumbent business agent Carlson announced at this meeting that he opposed the payment of Petitioners' attorneys' fees and would bring this approval up for rescission at the next meeting.

12. On February 20, 1961, the membership of the Union, by a vote of 142 to 89, rescinded the action of February 6, 1961, only insofar, however, as Petitioners' reimbursement for their attorneys' fees and related expenses were concerned.

13. In May, 1961, new charges were filed by the business agent Carlson against various Petitioners and other members alleging violation of various union principles. The alleged violations pertained to the May, 1960, meetings held by Petitioners in their homes regarding their selection of opposition candidates and to various statements made by Petitioners in their affidavits in the first federal court action. Pursuant to stipulation entered into in the first federal court action, the membership of the Local Union elected a Special Trial Board to hear these charges. Attorneys represented both the charging party and the accused Union members in this second series of union trials, all witnesses were sworn and a court reporter transcribed the testimony. Lester Nelson was the first Petitioner tried in July, 1961. His trial took six nights. After the trial, but before the Special Trial Board had reported its decision to the membership, the representative of the International Union, Petersdorf, recommended a settlement of all issues to the Special Trial Board on July 25, 1961. This recommendation included a provision that all attorneys' fees and expenses for both groups were to be paid.

14. On August 7, 1961, this Special Trial Board dismissed the charges against Nelson, reprimanded both groups, and recommended that the attorneys' fees and expenses for both sides in the two series of union trials and in the first federal court action be paid by the Local Union. The membership of the Local, on August 7, 1961, approved this recommendation. Respondent Johnson declared his disapproval of the Trial Board recommendation on this occasion.

15. On August 12, 1961, in the absence of Respondent Jensen, the regular treasurer, Johnson appointed an acting treasurer, Romine, who might be described as being in Johnson's "camp." Romine wrote a letter to the General President of the International Union requesting him to investigate the propriety of paying Petitioners' attorneys' fees as recommended by the Special Trial Board. The request was made without authorization or direction from the membership of the Local Union.

16. On August 18, 1961, the General President of the International replied to Romine and suggested that he hold up payment of Petitioners' attorneys' fees until an investigation had been made. The acting treasurer advised Respondent Johnson of the receipt of this letter.

17. On August 21, 1961, Respondent Johnson attempted to rescind the approval of the membership of the Special Trial Board's recommendations. The at-

tempted rescission failed. The suggestion of the International President was read. The membership voted not to adopt this suggestion. Johnson then submitted to the membership for approval or disapproval the vouchers of Petitioners, item by item, for their attorneys' fees and expenses in the first federal court action. The membership approved these expenses, item by item, by a vote of 38 to 16.

18. On September 4, 1961, Respondent Johnson wrote the International President and requested an order from the International President that he, Johnson, should not pay these bills. This letter was written after the membership had directed Respondents to pay the bills and was written by Johnson without authorization from the membership.

19. On September 6 and September 13, 1961, the officers of Local 386 met with Respondents and voted 8 to 0, Respondents abstaining, directing Respondents to pay the bills of Petitioners. Respondents refused to do so. Respondent Johnson on both of these occasions sought Petitioners' agreement to submit their bills to the entire membership by a referendum vote. Petitioners refused to do so on the ground that their bills were lawful, had already been duly approved, and Respondents had the duty under the Constitution and By-Laws to execute checks in payment thereof.

20. Later in September, 1961, Respondent Johnson sought out the same International representative, Petersdorf, who had previously recommended to the Special Trial Board that all attorneys' fees be paid, and was then advised orally by Petersdorf not to pay Petitioners' duly approved bills. Respondent Johnson also sought out and was advised orally by an International Vice President not to pay Petitioners' duly approved bills.

21. On September 18, 1961, Respondent Johnson replied to questions from the Union membership regarding his nonpayment of these bills that he was under orders from the International not to pay these bills.

22. On September 29, 1961, the General President of the International Union, in response to Romine's and Johnson's letters, advised by letter Romine, the Respondent Jensen and Respondent Johnson that the investigation of the International had been completed and that "in our opinion" Petitioners' bills and expenses were "individual indebtedness of these members" and should not be paid by the Local Union. None of the Petitioners were contacted during this "investigation." The letter said that there was "no objection" to payment of attorneys' fees for the Union trials.

23. These communications were read to the membership on October 2, 1961. Petersdorf, the representative of the International Union was present at said meeting and stated that if the Respondents did pay the bills they would be acting in violation of the Union Constitution and subject to removal. At this same Union meeting Petitioners' attorneys served a notification on behalf of Petitioners to the Union officers, pursuant to section 501(b) of the L.M.R.D.A., requesting corrective or remedial action to be taken by the Union officers against Respondents for their refusal to pay the bills, or else Petitioners would themselves commence action. Respondents and Petersdorf told Petitioners to go ahead.

24. This litigation was commenced on October 16, 1961.

25. On November 15, 1961, a month after this litigation began, the General Executive Board (GEB) of the International Union unilaterally, on its own motion, determined that the action of the Local in approving the recommendations of the Trial Board respecting payment of fees and expenses for Petitioners was null and ineffective because the approval was "the subject of an unauthorized recommendation and because [it was] not properly voted upon." The GEB suggested that the membership of the Local reconsider its authorization of the reimbursement to Petitioners "for the reasons: (1) that it is against the general policy of the Brotherhood to sanction expenditure of local union funds for such purposes

and, (2) the expenditure of such funds for such purposes might well constitute a violation of Title V of the Landrum-Griffin Act." The GEB further determined that if the Local nevertheless decided to conduct a vote on the question of authorizing the expenditure for such purposes, the Local should take such vote by secret ballot referendum vote of the entire membership by mail. The GEB did not cite any Union constitutional provisions as authority for the above mentioned conclusions.

26. The Local has not taken the suggested referendum vote.

## DISCUSSION AND CONCLUSIONS OF LAW

### I. PRELIMINARY DECISION AS TO THE INTERPRETATION OF SECTION 501

The instant case involves section 501 of the L.M.R.D.A. This is an important section. It will doubtless play a large role in the L.M.R.D.A. It has been praised on the one hand [3] and denounced on the other.[4] However, it does raise certain problems. This section speaks broadly in one breath and narrowly in the next. Union officers are said to occupy "positions of trust." Volumes have been written on the duties of trustees; the wealth of authority staggers the imagination. The next sentence enumerates certain duties but the list is obviously not complete, for the reader is told to take into account "the special problems and functions of a labor organization." [5] The duties are thus as broad as human experience in the labor field. Officers are told, inter alia, not to deal adversely with their unions. This latter word is one of apparent simplicity, but its meaning has not been simple of decision in this case, now in its third appearance before this Court alone. Further, section 501(b) provides, upon violation of part (a), that suits may be brought "to recover damages or secure an accounting or other appropriate relief." The first two forms of relief involve money. Is the "other appropriate relief" limited to pecuniary matters or could broader relief, including an injunction, be had

3. "These provisions [sections 501(a) and 501(b)] are potentially among the most important in the L.M.R.D.A. If individual members have the initiative and interest to bring suit, the Becks, Hoffas, and Webers may be required to account not only for any misappropriations but also for all the profits which they have made by virtue of their offices." Cox, Law and National Labor Policy 92 (1960).

4. Senator Morse was disturbed by the potential of Section 501. He said, 105 Cong. Rec. 16387 (daily ed. Sept. 3, 1959):
"Section 501 of the conference committee bill is one of the bill's most dangerous provisions. * * *
"I do not think anybody is being kidded. What do the antilabor forces want in this country? They want to get procedures into this bill so that some dissident element in the union, stooging for an employer, can cause trouble within the union when the union votes funds for political purposes."
George Meany was also quoted in the Congressional Record as saying, "[T]he [House] committee has proceeded to establish standards of fiduciary responsibility which could only lead to widespread confusion and the multiplicity of litigation."

105 Cong. Rec. A6401 (daily ed. July 15, 1959); see Dugan, Fiduciary Obligations Under the New Act, 48 Georgetown, L.J. 277, 290 (1959) (excellent summary of legislative history).

5. "The principles stated in Section 501(a) were drawn from the Restatement of Agency in an effort to incorporate the whole body of common law precedents defining the fiduciary obligations of agents and trustees with such adaptations as might be required to take into account 'the special problems and functions of a labor organization. * * * '" Cox, Internal Affairs of Labor Unions Under the Landrum-Griffin Act, 58 Mich.L.Rev. 819, 828 (1960). See also 105 Cong. Rec. 17900, 86 Cong., 1st Sess. (1959) (remarks of Senator Kennedy); H.Rep.No. 741, 86th Cong., 1st Sess. 81 (1959) U.S. Code Cong. & Adm.News, 1959, p. 2318. Senator Goldwater thought that the previously quoted phrase weakened the bill and inserted a brief which said in part, "A major loophole is created by limiting the fiduciary duty to take into account the special problems and functions of a labor organization." 105 Cong. Rec. 13017 (daily ed. July 27, 1959).

thereunder? Doubt is cast upon the question by part of the legislative history and because another part of the Act specifically provides injunctive relief to secure similar rights. See section 102 of the Act, 29 U.S.C.A. § 412.

A preliminary decision is thus necessary. What role are the Courts to play in deciding cases under § 501? One possible answer appears in the case of Textile Workers Union of America v. Lincoln Mills of Alabama, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1956). That now famous decision involved the meaning of section 301(a) of the Taft-Hartley Act of 1947, 61 Stat. 156, 29 U.S.C.A. § 185. One line of authority had held that section to be jurisdictional only. Another body of cases had held that it authorized federal courts to fashion a body of federal law for the enforcement of collective bargaining agreements. After an extensive review of the legislative history, the Court took the latter approach, saying 353 U.S. at 456–457, 77 S.Ct. at 917–918, 1 L.Ed.2d 972:

> "We conclude that the substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws. See Mendelsohn, Enforceability of Arbitration Agreements Under Taft-Hartley Section 301, 66 Yale L.J. 167. The Labor Management Relations Act expressly furnishes some substantive law. It points out what the parties may or may not do in certain situations. Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem. See Board of Commissioners v. United States, 308 U.S. 343, 351 [60 S.Ct. 285, 84 L.Ed. 313]. Federal interpretation of the federal law will govern, not state law. Cf. Jerome v. United States, 318 U.S. 101, 104 [63 S.Ct. 483, 87 L.Ed. 640]. But state law, if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy."

Is this sort of mandate equally applicable to § 501 of the L.M.R.D.A.? Lincoln Mills is not mentioned in the legislative history, but Senator Javits said, "Once fiduciary responsibility is stated it will soak up all the common law, all the state law, and all the Federal law." 105 Cong. Rec. 5855 (daily ed. April 23, 1959). The legislative history will be more fully discussed later. It will be adequate here to state that the relevant House committee report, Supplementary Report, H.Rep. No. 741, 86th Cong., 1st Sess. 81 (1959), and corresponding remarks on the Senate floor, 105 Cong.Rec. 16415 (daily ed. Sept. 3, 1959) (remarks of Senator Kennedy) are in accord on the instant point: "The general principles stated in the bill are familiar to the courts, both State and Federal, and therefore incorporate a large body of existing law applicable to trustees, and a wide variety of agents."

All the commentators have simply assumed that methods similar or equal to those outlined in Lincoln Mills will have to be employed to a provision drafted in the manner previously described. Wollett, Fiduciary Problems Under Landrum-Griffin, New York Univ. Thirteenth Annual Conference on Labor 267, 273 (1960); Dugan, Fiduciary Obligations Under the New Act, 48 Georgetown L.J. 277, 298 (1959); Note, The Fiduciary Duty of Union Officers under the L.M.R.D.A.: A Guide to the Interpretation of Section 501: 37 N.Y.U.L.Rev. 486, 489 (1962). It is thus not surprising that the courts have all followed this path. The leading case under Section 501 is Highway Truck Drivers and Helpers Local 107 v. Cohen, 182 F.Supp. 608, 617 (E. D.Pa.1960), aff'd 284 F.2d 162 (3rd Cir.), cert. denied, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744. Speaking of Section 501, the Court there said:

> "This section, quoted earlier, attempts to define in the broadest terms possible the duty which the

new federal law imposes upon a union official. Congress made no attempt to 'codify' the law in this area. It appears evident to us that they intended the federal courts to fashion a new federal labor law in this area, in much the same way that the federal courts have fashioned a new substantive law of collective bargaining contracts under § 301(a) of the Taft-Hartley Act, 29 U.S.C.A. § 185(a). See Textile Workers Union of America v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972. In undertaking this task the federal courts will necessarily rely heavily upon the common law of the various states. Where that law is lacking or where it in any way conflicts with the policy expressed in our national labor laws, the latter will of course be our guide.

"We turn then to Section 501, not expecting to find a detailed command or prohibition as to the particular act complained of, but rather to find a general guide which, properly developed, will lead us to an answer."

Most of the above language was quoted with approval in Penuelas v. Moreno, 198 F.Supp. 441, 447 (S.D.Cal.1961). Another court has also concluded that Congress, in enacting the L.M.R.D.A., intended the federal courts to fashion and apply a body of law based upon the policy of our national labor laws. Parks v. International Brotherhood of Elec. Workers, 203 F.Supp. 288, 292 (D.Md.1962), citing authority at n. 10. All of the foregoing indicates that in ascertaining the fiduciary duty imposed by section 501 it will be both necessary and desirable to examine closely the policy and purposes of the L.M.R.D.A. and to rely with confidence on the applicable state decisions.[6]

## II. VIOLATION OF THE DUTY IMPOSED BY THE STATUTE

The Petitioners' allegations here are essentially that these Respondents have violated their positions of trust by taking a position adverse to their union, e. g., not paying these Petitioners as ordered. There is no question that they have not obeyed their Local; the question is whether they have an excuse. This in turn hinges upon whether the letters from the General President and the General Executive Board can validly be interposed between the Respondents and their Local.

It should first be pointed out that there is strong evidence, and this Court has

---

6. In approaching this problem the words of Judge Learned Hand might well be recalled, United States v. Klinger, 199 F. 2d 645, 648 (2d Cir., 1952):
"When we ask what Congress 'intended,' usually there can be no answer, if what we mean is what any person or group of persons actually had in mind. Flinch as we may, what we do, and must do, is to project ourselves, as best we can, into the position of those who uttered the words, and to impute to them how they would have dealt with the concrete occasion. He who supposes that he can be certain of the result is the least fitted for the attempt."
In speaking of this task, two other commentators have said, Bickel and Wellington, Legislative Purpose and the Judicial Process: The Lincoln Mills Case, 71 Harv.L.Rev. 1, 16–17 (1957):
"The task of projection and imputation is often a formidable one of historical reconstruction. The atmosphere which gave birth to a statute, the needs and agitation which evoked it must be sympathetically understood. Its purpose, however dimly made out, must be translated forward and related to contemporaneous or later relevant enactments and to other changes in the landscape such as the development of new constitutional doctrines. The judge who, in Judge Learned Hand's phrase, flinches from this task is necessarily reduced, in the words of Judge Augustus Hand, to employing the 'judicial hunch,' and to acting as if it were proper for him to have 'everything in his own hands.' The same is true of the judge who falters in the performance of the task and, afflicted with a poverty of patience or imagination or empathy, loses sight of the distinction between a purpose which may reasonably be imputed to 'those who uttered the words,' and a purpose he himself now holds or would have held as a legislator."

found, that these Respondents made both written and oral attempts to solicit "orders" from the higher levels of the Union to justify their non-execution of the checks. Conceivably, it might be possible to say simply that these facts show that there was no actual fear of reprisal from the General President or the General Executive Board, that their reliance on these letters was not in good faith, and that they have therefore acted adversely in not paying the checks as ordered. The evidence suggests, however, that the higher levels of the Union, once brought into the matter, actually did oppose payment of these attorneys' fees. See Findings of Fact 20, 23, and 25, supra. It might also be inquired whether there was any basis in the Union Constitution for the unilateral action taken by the GEB— one month after this suit was started.[7] There is also evidence that the Respondents have a strong personal animosity toward these Petitioners. The evidence suggests that the Respondents particularly resent the Petitioners' successful resort to the federal courts in the first suit. Other factors, however, demand consideration. The other factors are, of course, the letters received by the Respondents from higher levels in the Union. These letters comprise the principal, if not the only, defense of the Respondents in this case.

The letters of the General President can hardly be considered of any great weight. They suggest and advise but do not direct or command. The Respondent Johnson seems to have understood that the letter of August 18, 1961, was not an order because on August 21 he attempted to rescind previous approval of these attorneys' fees and on September 4 he wrote to the General President requesting an "order." See Findings of Fact numbers 17 and 18. The letter of September 29 from the General President is also couched in the form of an opinion. Oral communications which the Respondents might have received (after soliciting them) might have been in the form of orders, but it would seem that the only thing which can save the Respondents here is the letter from the GEB on November 15, 1961, containing numerous reasons why the checks should not be paid. These objections by the GEB should be examined in some detail, despite their somewhat unusual manner of announcement to the Local. It might first be recalled that these pronouncements are by the same body which solemnly approved the convictions obtained in the first Union trials, trials in which carefully drawn Union procedure was thrown to the winds and previously innocent Union members were arbitrarily presumed to be guilty. Although the apparent blindness to justice in that case and the readiness to thwart the Local's wishes in the instant matter seem somewhat inconsistent, it is, of course, not necessary to decide whether that body measured out justice with an uneven

7. See Note, The Fiduciary Duty of Union Officers Under the L.M.R.D.A.: A Guide to the Interpretation of Section 501, 37 N.Y.U.L.Rev. 486, 498 (1962). Speaking of the reconciliation of union constitutions and the policies implicit in the L.M.R.D.A., the writer made it clear there was no dearth of State authority for critical appraisal of union constitutions when the purposes of the Act might demand it. After a review of the State authorities, it was concluded, supra, at 501–502:

"An entire body of case law, then, indicates that courts have arrived at a rather definite philosophy in handling problems involving internal affairs of labor organizations. Once the decision has been made to extend court supervision into the area of internal affairs of unions, supervision is not to be rendered ineffective by viewing the union's constitution and by-laws as sacrosanct. Certain union problems arise which can be solved fairly and efficiently for the general membership only by refusing to honor unfair constitutional provisions or by-laws. Similar problems can be expected to cause the federal courts, in shaping the fiduciary duty of Section 501 of the L.M.R.D.A., to take the same approach."

These words are relevant here when this case is viewed as one involving a possible unfair use of broad constitutional powers. See also Summers, The Law of Union Discipline: What the Courts Do In Fact, 70 Yale L.J. 175, 180–184 (1960).

hand. None of those people are parties to this action. It is the Respondents' conduct only which is being adjudicated. However, it could be remarked that the GEB, once prodded to action, was not loathe to concoct a potpourri of reasons why these checks should not be issued. The call of duty was heard with indolence there and alacrity here. More important, however, is the possibility that rights conferred by Congress which were denied there were also discouraged here.

The GEB first said that the payments were the "subjects of an unauthorized recommendation." There can be no doubt that these payments were both suggested by the Trial Board of the Union and approved by the membership at a lawful meeting. Section (6) (a) of the Union Constitution provides, inter alia, that the funds of a local union may be used for such purposes "as may be required to properly transact its business, including * * * the payment of legally authorized bills." Section 163 appears to give to the local membership the power to determine what obligations the local shall pay. There is not a mention in the Constitution that this type of bill cannot be authorized. There is no question but that these bills *were* authorized. Therefore, this reason is without merit.

The GEB next said that these matters were not properly voted on, and were therefore null and ineffective. No specific provision of the Constitution was cited in support of this proposition. Careful scrutiny of that document reveals no indication that this matter could not be handled at a regular meeting. Some matters do require special procedure. For example, before a local can levy an assessment upon the membership to provide funds to relieve distress among members totally disabled from earning a living on account of injuries or sickness incurred while working at the trade, all members shall be legally notified that the proposed assessment will be given con-

sideration at the next meeting. Union Constitution, section 161(b). In addition, notice of the nomination meeting and the election meeting must be given by mail sent to ALL members at least five days prior to the nomination meeting. Such notice is to clearly state the date, time, place and purpose of these meetings. Union Constitution, section 170(b). There is no mention of special procedures in other circumstances. The number of members which considered the matters in question here seems to have been the average number of people who attended these meetings. The others perhaps should not have stayed away in such large numbers, but the fact of the matter is that they did. People in all walks of life are less mindful of greater privileges unexercised, e. g., the right to participate in local, state and national elections.[8] The number present was adequate to award attorneys' fees for the union trials; it seems strange to say—without more—that the same number could not approve fees for the federal action. It is one thing for a court to defer to the admitted power of the GEB to *construe* the Union Constitution; it is yet another to idly sanction the *rewriting* of that document. It is one thing for the GEB to make a basic change when peace prevails and passions are calm; it is something else when the rules are changed in the middle of a fierce contest—probably at the request of one faction. Compare Western Airlines v. Sobieski, 191 Cal.App.2d 399, 12 Cal.Rptr. 719 (1961) (elimination of cumulative voting in middle of stockholder fight held unfair). The same, incidentally, is true of the GEB's direction to the Local to take any future votes on such attorneys' fees by secret ballot referendum vote of the entire membership by mail.

The third reason offered by the GEB in its gratuitous letter of November 15, 1961, was that "the expenditure of such funds for such purposes might well con-

---

8. " * * * [W]e should recognize that the law cannot compel idealism or create the spirit of self-government. It cannot force union members to attend meetings or hold their officers to a strict accounting." Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich.L.Rev. 819, 853 (1960).

stitute a violation of Title V of the Landrum-Griffin Act." This is, of course, ultimately a matter of law for a federal court. It is enough to observe in passing that this contention is without substantial merit.

Finally, the GEB suggested that the Local reconsider voting payment of attorneys' fees for the first federal suit, saying that it is "against the general policy of the Brotherhood to sanction expenditure of Local Union funds for such purposes." This statement was not phrased as an order, but the evidence suggests that it was meant and taken that way. The power to declare this policy might be derived from sections 60(b) and 63(a) of the Union Constitution, which are admittedly quite broad.[9] Disregard of GEB decisions can lead to dire consequences under section 71 of the Union Constitution.[10] Although there are certainly limits to the uses to which these broad powers can be put,[11] it can be assumed for argument that the GEB did have this power.

Other provisions of the Constitution deserve examination also. The matter of Union trials is provided for in some detail in sections 259–290, pp. 112–127. At the outset of this part of the Constitution it is provided:

"All charges, trials, appeals, formal hearings and disciplinary action shall be governed by provisions of Sections 259 to 290 inclusive, unless otherwise provided for in this constitution."

After union trials have been discussed in detail from start to finish, the matter of resorting to the courts is taken up in section 289, p. 126. This section provides in essence that aggrieved union members must fully exhaust their internal administrative remedies before resorting to the courts. This the plaintiffs in the first federal action had clearly done.[12] Thus it is seen that although resort to the courts is expressly adverted to in the Constitution, the GEB explains that it is against the policy of the Brotherhood to sanction the expenditure of local union funds for such purposes. No more having been said, the basis of this policy is not clear. No reason for such policy is mentioned in sections 259–290, the only sections which are to govern such matters. Indeed, the entire thrust of those sections is directed towards fair play and union democracy.

The question, however, cannot be decided within the four corners of the Union Constitution. Extraneous factors are of equal consideration. The question is thus posed: Is the policy expressed by the GEB to be allowed to stand, considering all the peculiar facts and relevant legislation in this case. In considering this question, the distinction between the propriety of that decision and its legality

9. "Sec. 60(b) [T]he General Executive Board is authorized and empowered to conduct and manage the affairs of this organization between conventions, and to manage, invest, expend, contribute, use, lend and acquire union funds and property in the pursuit and accomplishment of the objectives set forth in the Constitution of the Brotherhood."

"Sec. 63.(a) The General Executive Board shall decide all points of law arising under the jurisdiction of the Brotherhood and also all grievances and appeals, unless otherwise provided in this constitution; their decisions shall be in force and effect unless reversed in accordance with the procedure set forth in this constitution."

10. "Sec. 71. The orders and decisions of the G.E.B. between Conventions are su-

preme. Officers of subordinate bodies must obey them and faithfully carry them out; any action by an officer of a subordinate body contrary to such decisions and orders, whether such contrary action consists in the making of a motion, the entertaining of such motion or aiding and abetting in the making or entertaining of such motion, shall constitute a violation of this section. The G.E.B. shall be authorized to suspend, immediately, such offending officer of such subordinate body; following such suspension the offending officer shall be accorded a hearing as provided for in the section dealing with 'Charges, Trials, Appeals and Disciplinary Action' and, if found guilty, shall be disciplined as therein provided."

11. See fn. 7 supra and accompanying text.

12. See Finding of Fact No. 9 supra.

should not be overlooked. See Highway Truck Drivers and Helpers Local 107 v. Cohen, 182 F.Supp. 608, 618 (E.D.Pa. 1960), aff'd 284 F.2d 162 (3rd Cir.), cert. denied, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed. 2d 744.

This case had its origin in an internal union dispute. Such disputes are common and should tip the scales of justice neither one way nor the other. Next came charges and trials, equally commonplace perhaps. Some of the accused were found innocent. At this point emotion doubtless overpowered reason, for the carefully considered constitutional safeguards for union trials were discarded. The accused were presumed guilty at the outset, and, with this boost, those in power achieved their will and the remainder were found guilty. Appeal was available and appeal was made. Appeal was fruitless, however; the results were affirmed. Doubtless outraged at this travesty of justice, the intransigents took their case to the federal court of this district, alleging violations of sections 102(a) (2) and (5) of the L.M.R.D.A., 29 U.S.C.A. §§ 411(a) (2) and (5). This course proved more fruitful and union trials were provided with more orderly and fair procedures. Doubtless pleased at these beneficial results, the Local adopted the recommendations of the general representative and the Trial Board and awarded these Petitioners their attorneys' fees for their Court action. Then came the event which has caused three more lawsuits.[13] The Respondents would not execute the checks, pleading the disapproval of a higher authority hastily summoned. First the General President (GP) and then the GEB came to the Respondents' aid. "Policy" forbade the execution of these checks, despite the fact that the L.M.R.D.A. had been violated in the first union trials.

The case in this posture appears to be one of conflicting policies. Underneath the policy choice of the GEB lie certain cold facts: capricious usage of union members' rights, inexplicable approval of unfairness by the GEB, vindication in the courts, restitution of attorneys' fees by the membership of a gratified local, and pronouncement on high that Union "policy" had been thwarted and that the will of the Local should be denied. These facts are erosive of the foundation of the GEB's policy choice. They call for the consideration of other policies expressed in the L.M.R.D.A. This Act was no hasty judgment—no cursory pronouncement of "policy." This Act was rather a product of lengthy deliberation, and it deserves commensurate consideration by this Court.

It is not necessary to say that any of the specific provisions of the Act have been transgressed here for purposes of the narrow issue at hand. The ultimate question is, of course, one of "adversity;" the immediate question is only one of the effect of the letter from the GEB. Policies lie at the heart of the latter issue. This is not surprising, for as the Supreme Court pointed out in the Lincoln Mills case, supra 353 U.S. at 457, 77 S.Ct. at 918, 1 L.Ed.2d 972, about federal labor law:

"[It] expressly furnishes some substantive law. It points out what the parties may or may not do in certain situations. *Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation* and fashioning a remedy that will effectuate that policy." (Emphasis added)

The present question seems to lie in the "penumbra;" it might be affected by

---

13. There have been three Federal actions. This one is the second. The Petitioners have also filed a third action in this Court seeking an injunction to prevent the Respondents' attorneys' fees in the second Federal action from being paid from the Local's treasury, as voted by the Local. The Petitioners in the third action rely on the Cohen case supra, 182 F.Supp. 608. The Petitioners have also filed a suit in the State courts against these same Respondents asking for substantially the same relief as is sought in this case.

the purposes of the L.M.R.D.A. even if not precisely decided by the language. Viewed in this light, the case calls for a determination of the broader policies underlying those provisions. The policy choices of the GEB must be then compared with those of the Congress. It will be enough if those policies are irreconcilable.

Construing of statutes has long been a familiar part of the judicial function. It is more prevalent in some areas of the law than in others. For example, astute courts in Conflict-of-Laws cases have long employed this procedure. See, e. g., Emery v. Burbank, 163 Mass. 326, 39 N.E. 1026, 28 L.R.A. 57 (1895) (per Holmes, J.); see generally Currie and Lieberman, Purchase Money Mortgages and State Lines: A Study in Conflict-of-Laws Methods, 1960 Duke L.J. 1; Currie, Survival of Actions: Adjudication versus Automation in the Conflict of Laws, 10 Stan.L.Rev. 205 (1958). An increasing use of the process by state courts in that context has been favorably noted by the Supreme Court, Richards v. United States, 369 U.S. 1, 12, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962),[14] and seems sanctioned in this one by the express language in Lincoln Mills.

█ The technique is familiar. First the statute is closely examined to determine the precise policies which the legislative body meant to express. Second, the fact situation at hand is studied to see whether the forum has a legitimate interest in the application of those policies. If a state court finds that the forum state has a valid interest in the application of its law and policy, it can apply the law of the forum even though another state also might have such an interest. See, e. g., Watson v. Employers Liab. Assur. Corp., Ltd., 348 U.S. 66, 75 S.Ct. 166, 99 L.Ed. 74 (1954); Gordon v. Parker, 83 F.Supp. 40, (D.Mass.1949); Grant v. McAullife, 41 Cal.2d 859, 264 P.2d 944, 42 A.L.R.2d 1162 (1953); Emery v. Burbank, 163 Mass. 326, 39

N.E. 1026, 28 L.R.A. 57 (1895); Schmidt v. Driscoll Hotel, Inc., 249 Minn. 376, 82 N.W.2d 365 (1957); Kilberg v. Northeast Airlines, Inc., 9 N.Y.2d 34, 211 N.Y. S.2d 133, 172 N.E.2d 526 (1961); Haumschild v. Continental Casualty Co., 7 Wis.2d 130, 95 N.W.2d 814 (1959); see also cases cited in Richards v. United States, 369 U.S. 1 at fn. 26, 27, and 31, 82 S.Ct. at 592, 593, 7 L.Ed.2d 492 (1962); see generally Currie, The Constitution and the Choice of Law: Governmental Interests and the Judicial Function, 26 U. of Chic.L.Rev. 9 (1958). Federal law of course pre-empts conflicting State law. A *fortiori* if Federal policies are applicable, then mere Union policies must give way. The instant litigation is obviously not a Conflict-of-Laws case in the usual sense. There is, however, a possible conflict between federal and union policy. The case also involves a choice of forum, in a manner of speaking. The Respondents here have pleaded that the case is not one for the federal courts; it is urged that the matter be left to the state courts. The authorities cited are thus somewhat helpful in resolving these aspects of the case. Those decisions seem to illustrate the general type of analysis required here. Those courts examined the policy of the relevant legislation in those Conflict-of-Laws cases in somewhat the same manner that Lincoln Mills seems to have dictated for federal labor law cases.

█ The task at hand first calls for an examination of the findings, purposes and policy expressed by the Congress in Section 2 of the Act, 29 U.S.C.A. § 401, which provides in part:

"Sec. 2 (a) The Congress finds that, in the public interest, it continues to be the responsibility of the Federal Government to protect employees' rights to organize, choose their own representatives, bargain collectively, and otherwise engage in concerted activities for their mutual aid or protection; * * * and

---

14. Noted in 1962 Duke L.J. 463. See also Note, 74 Harv.L.Rev. 1652 (1961) (approves interest analysis applied in New York case).

that \* \* \* *it is essential that labor organizations, employers, and their officials adhere to the highest standards of responsibility and ethical conduct in administering the affairs of their organizations,* \* \*. (Emphasis supplied).

"(b) The Congress further finds, from recent investigations in the labor and management fields, that *there have been a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct which require further and supplementary legislation that will afford necessary protection of the rights and interests of employees* and the public generally as they relate to the activities of labor organizations, employers, labor relations consultants, and their officers and representatives. (Emphasis supplied).

"(c) The Congress, therefore, further finds and declares that the enactment of this Act is necessary to eliminate or prevent improper practices on the part of labor organizations, employers, labor relations consultants, and their officers and representatives which distort and defeat the policies of the Labor Management Relations Act, 1947, as amended, and the Railway Labor Act, as amended, \* \* \*."

A more detailed discussion of the problems encountered is found in Senate Report No. 187, 86th Cong., 1st Sess. 5–7 (1959), accompanying S. 1555, the Kennedy-Ervin Bill. Concern is there expressed over union bureaucratic tendencies, antiquated procedures, abuse of power, and other difficult internal problems. Similar findings appear in House Committee Report No. 741, accompanying H.R. 8342, the Elliott Bill, which, though not reported out of committee with a majority vote, contained the same fiduciary provision as the Landrum-Griffin Bill. Beneath the legislative history of the L.M.R.D.A. which was compiled in 1959 are the reports of the McClellan Committee, which provided the impetus for the L.M.R.D.A. The first report of the committee's work in 1958 will be discussed in more detail later; it is enough to say here that that committee was shocked, as was the nation, at the corruption, greed, and abuse of power found in parts of the American labor movement. The conclusions of that committee showed an overwhelming concern for the preservation of union democracy. See Interim Report of the Select Committee on Improper Activities in the Labor or Management Field, S.Rep.No.1417, 85th Cong., 2d Sess. 452 (1958). The legislative history is also replete with the outrage and concern felt by those members of the McClellan Committee after observing the tragic and tyrannical domination which had been achieved over some of the union members in this country. Senator McClellan's description of the whole sordid mess will be reported later in the opinion; it is enough to report here that he was sorely concerned about the conduct of those occupying positions of trust and power in the American labor movement. There can, in short, be little doubt that Congress meant to lay its hands upon irregular internal affairs. See e. g., 105 Cong.Rec. 5489 (daily ed. April 16, 1959) (remarks of Senator Ervin); [15] 45 Va.L.Rev. 203–206 (1959) (remarks of Senator Kennedy); see generally Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich.L.Rev. 819 (1960).[16]

15. Reprinted infra at fn. 64.

16. "The state alone cannot achieve true union democracy but it has much to contribute. Preserving democracy requires protecting individuals and minorities against numerical majorities or an officialdom which acts with the majority's consent. *It is not enough to put our trust in self-restraint.* The task of assuring workers the ultimate control of the affairs of their unions should be undertaken by law because it is the law which gives a union, as bargaining representative, the quasi-legislative power to bind employees in the bargaining unit with-

There can in addition be little doubt that this case presents some irregular internal affairs. But there are express as well as implied policies. The L.M.R.D.A., inter alia, encourages and protects freedom of speech in the union hall. Section 101(a) (2).[17] The L.M.R.D.A. encourages and protects proper safeguards for union disciplinary proceedings. Section 101(a) (5).[18]

Are the facts in this case such as to bring this letter from the GEB clearly within the scope of this Court's concern? It is one thing for the forum to be able to apply its law from the standpoint of power. Cf. Emery v. Burbank, 163 Mass. 326, 39 N.E. 1026 (1895). It is another to definitely feel that the legislative body would wish the statute to be applied in the fact situation before the court. Cf. Bernkrant v. Fowler, 55 Cal. 2d 588, 12 Cal.Rptr. 266, 269, 360 P.2d 906, 909 (1961). The question is thus whether the above policies are of sufficient relevance to this case to override the policy choice of the GEB. The facts are clear. The Petitioners' rights to freedom of speech were violated by the first union trials. The Petitioners' rights to disciplinary proceedings with proper safeguards were violated in the first union trials. The GEB did not correct these wrongs on appeal. The Petitioners had to seek their remedy in the federal courts, incurring large expense. The Local benefited from this expense, and it voted to reimburse Petitioners for this expense. The GEB then said this reimbursement was contrary to Union policy.[19] What will be the result if this policy pronouncement of the GEB is allowed to stand? It seems patently clear that these Petitioners—and perhaps others like them—will be slow to assert in the future these rights conferred upon them by Congress. These are important rights with which the GEB is tampering. One writer has described them well. Cox, Law and National Labor Policy 95 (1960):

*"Union practices pertaining to the admission and expulsion of members*

out their consent." (Emphasis supplied.) Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich.L.Rev. 819, 830 (1960).

17. "(2) Freedom of speech and assembly.— Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations."

18. "(5) Safeguards against improper disciplinary action.—*No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member* has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

"(b) Any provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect. Pub.L. 86–257, Title I, § 101, Sept. 14, 1959, 73 Stat. 522."

19. Petitioners make two strong arguments about this letter of November 15, 1961. The first is that it came too late, i. e., it was obviously intended by the General Executive Board to help the Respondents in the suit pending against them. The second is that it was intended as an exculpatory measure within the meaning of the last sentence of Section 501(a), 29 U.S. C.A. § 501(a), and thus void as against public policy. These arguments are not without merit, particularly the first one, but the difficulty is that their acceptance involves deciding the intention of people who were never present in court for examination. In view of the other strong (and more certain) facts in this case, there is no need to decide the questions. However, for a discussion of the last sentence of Section 501(a) see the Cohen case, supra, 182 F.Supp. at 617–618.

*are the threshold to democracy in the government of labor organizations.* An employee in a bargaining unit who is unfairly excluded from the union which represents the unit or who is unjustly expelled from membership has no opportunity to participate in fixing the terms and conditions of his employment. He is bound by the action of an organization in whose councils he has no voice. In his case it is a fraud to call collective bargaining an instrument of industrial democracy. *Expulsion may be used as a method of suppressing criticism or destroying political opposition.*" (Emphasis supplied.)

These latter words seem prophetic indeed, for suspension was used for these exact purposes in this case.

The importance of the rights involved here can be further illustrated by examining the outspoken support given these rights by some of the state courts. A number of prominent legal scholars have been saying that most of the state courts have been protecting these rights by the application of property, contract, and tort concepts to the cases which have come before them. See e. g., Chafee, The Internal Affairs of Associations not for Profit, 43 Harv.L.Rev. 993 (1930); Cox, The Role of Law in Union Democracy, 72 Harv.L.Rev. 609 (1959); Summers, Legal Limitations on Union Discipline, 64 Harv.L.Rev. 1049 (1951). Perhaps the first state court decision to fully recognize the valuable right of freedom of speech within the Union was Crossen v. Duffy, 90 Ohio App. 252, 103 N.E.2d 769 (1951). The Crossen case involved a bitter intra-union controversy, just as this one does. The only real difference in the basic facts of the two cases is that the dissidents there were attempting to unseat the national officers and here the local officers were under attack. In that case the first assault came in 1947. The attack failed and the incumbents were reelected. After the election, however, steps were taken by the national officers of the N.B.O.P. (the Potters' Union) to deal with future attempts to unseat them. A resolution was passed at the 1947 National Convention, 103 N.E.2d at 771, which was subsequently put into the Union Constitution, after being modified "by the National Secretary without the authority of a convention of the Brotherhood, or a referendum of the members * * *." 103 N.E.2d at 772. That section provided as follows:

"Any member of the N. B. of O. P. who is not a citizen of the United States or Canada shall not be eligible to hold any national office. Any members contesting for national office shall conduct themselves in a proper manner. False accusations or misrepresentations, untruths, or use of degrading literature shall be brought to the attention of the delegates in Convention following the National election. Any candidate convicted by a majority vote of delegates in Convention, of enumerated practices may be reprimanded, fined, suspended or expelled after due and proper hearing. If the offending member candidate is not a delegate, the Convention shall by a majority vote elect a body of five members as a special court to hear the case, with power to fine, reprimand, suspend or expell."

At the 1949 National Convention the battle was renewed. A circular called the "Green Sheet" was drawn up to oppose the incumbent administration and espouse the candidacy of others. The pertinent portions of this handbill are as follows, 103 N.E.2d at 774:

"Election N. B. O. P. Officers First Meeting in May

"VOTE
"We believe the present administration should be changed
_____ because of its _____
"1. Reluctance to Accept Laws and Courts of U.S.A.
"2. Illegal Salary Increases.

"3. Arbitrary Disregard of Wishes and Opinions of Locals and Members.

"4. Unfair Election Tactics.

"5. Use of Potters Herald for Personal Propaganda Agency and to Impugn Motives and Attack Members.

"6. Inefficiency in Office.

"7. Denial of Help to W. Va. Federation of Labor in Efforts to Increase Silicosis Benefits.

"8. Duffy's Open Shop Attitude.

"RESTORE DEMOCRACY IN N. B. O. P."

The opposition candidates were unsuccessful and were rewarded for their efforts with union trials and subsequent punishment. 103 N.E.2d at 772. The Crossen case did not involve *any* of the candidates; the plaintiffs were merely union members who had been charged, tried, and convicted of either publishing or circulating "improper campaign literature." 103 N.E.2d at 775. The "improper campaign literature" was the handbill previously quoted. The only evidence presented against three of the plaintiffs at the union trials was that they had signed the "Green Sheet" and ordered distribution of it. None of these three men were present at the National Convention in 1949. 103 N.E.2d at 776. The other two plaintiffs neither signed the "Green Sheet" nor were present at the National Convention, but were convicted on testimony that both had helped to circulate the "Green Sheet" and possibly other literature as well. 103 N.E.2d at 777.

The Ohio trial court held that the Union trials were void and enjoined the defendants from collecting the fines. This decision was affirmed on appeal. The Court first said, 103 N.E.2d at 777:

"We do not find that any of these charges fall within the classification of libel. It seems to us rather that the charges complained of fall within the scope of free, if not fair, criticism and the free speech guaranteed by the United States Consti-

tution and the Constitution of Ohio. * * *

"In reaching our decision, we recognize that the National Brotherhood of Operative Potters is a strong union, a democratic union. Its record for successful leadership in the industrial field has been outstanding. A strong organization presupposes strong leadership. Such leadership calls forth strong adherents and often strong critics and lively contests, not to be found, because not tolerated, in a totalitarian climate. *In our political democracy and in our economic achievements a measure of our strength in this country has been our ability to permit, and benefit by, criticism and the competition which nurtures that strength.* (Emphasis added.)

"The important and apparently original legal question squarely presented in this case is whether a rule adopted by a mutual benefit association of the character of a labor union may infringe upon and take away fundamental liberties otherwise granted by the Constitution of the United States and the Ohio Constitution. It is quite true that by joining a mutual benefit association an individual consents to be bound as a member by rules and regulations not affecting non-members. How far may a mutual benefit association go in restricting the freedom of members?"

The Court there noted that the Potters Union was subject to the Ohio and United States Constitutions. The Court then adverted to some procedural defects in the Union trials and the vagueness of the previously quoted Union constitutional provision, concluding at 103 N.E. 2d at 778–779:

"We are loathe to say, in view of the provisions of the Constitution of the United States and of the state of Ohio, guaranteeing free speech, that we should construe this indefinite language as intending to deprive members of the union of the right

of free and fair criticism, otherwise theirs, although the 1949 Convention appears thus to have construed it and to have punished plaintiffs on that basis. Examination of the facts before us impels us to hold that a member of a mutual benefit association continues to be a citizen of the United States, and *the free speech guaranteed by the United States Constitution permits him freedom in criticizing his union officials, as well as his public officials generally, subject always to the limitations imposed by the laws of slander and libel.* 64 Harvard Law Review 1071. In so declaring, we recognize that it is not generally the function of courts to control the policies or the internal affairs of labor unions, but the courts may and should protect the democratic processes within unions by which union policies and their leaders are determined. Upon this point, see the illuminating article entitled 'Legal Limitations on Union Discipline' by Clyde W. Summers, 64 Harvard Law Review 1049, at page 1073 and also, the article by Joseph Kovner entitled 'The Legal Protection of Civil Liberties Within Unions,' (1948) Wisconsin Law Review, at page 18.

"Particularly important seems to us the recognition that labor unions constitute a special type of mutual benefit association, standing in special relation to their members and to the state. Membership has become a frequent condition of employment, even as the right of every man to work has become increasingly recognized as one of the most valued rights of a free society. Viewing the important role of labor unions in this era, a court may well determine in a particular case that protection of their democratic processes is essential to the maintenance of our democratic government. * * *

"We hold that the action of the 1949 Convention in fining plaintiffs because of publication or distribution of the handbills constituted an infringement of the right of free speech possessed by plaintiffs, calling for exercise, under the peculiar circumstances of this case, of the equity powers of this Court to protect the plaintiffs in their property rights and in their calling." (Emphasis supplied.)

In short, unions are vastly different from other types of voluntary mutual benefit associations. Freedom of speech within the union is a valuable right which will be zealously guarded by the courts, and vague constitutional provisions engineered by those in positions of trust will not be allowed to hamper the democratic process within the union.

The New York Courts have perhaps been responsible for deciding over one-half of the State decisions involving union discipline. Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L.J. 175, 177 (1960). The New York case of Madden v. Atkins, 4 N.Y.2d 283, 174 N.Y.S.2d 633, 151 N.E.2d 73 (1958), involved a dispute within a local union very similar to the one in this case, and so it will not be described in detail here. In invalidating the expulsion of some of the minority members the New York Court of Appeals said, 174 N.Y.S.2d at 640, 151 N.E.2d at 78:

"If there be any public policy touching the government of labor unions, and there can be no doubt that there is, it is that traditionally democratic means of improving their union may be freely availed of by members without fear of harm or penalty. And this necessarily includes the right to criticize current union leadership and, within the union, to oppose such leadership and its policies. See Polin v. Kaplan, 257 N.Y. 277, 284, 177 N.E. 833, 835, supra. The price of free expression and of political opposition within a union cannot be the risk of expulsion or other disciplinary action. In the final analysis, a labor union profits, as does any democratic body, more by pertaining free expression and free

political oppostion than it may ever lose from any disunity that it may thus evidence."

The New York Court cited neither Crossen v. Duffy, supra, nor the work of Professor Summers of the Yale Law School, upon which the Ohio Court relied heavily, but did lean strongly on Polin v. Kaplan, 257 N.Y. 277, 177 N.E. 833, which is described infra at footnote 24.

Another State court has since joined the ranks of the outspoken. In Mitchell v. International Ass'n of Machinists, 196 Cal.App.2d 796, 16 Cal.Rptr. 813 (1961), petition for hearing denied, No. 24913 Cal.Sup.Ct. (1962), the trial court had sustained the right of a union to expel certain members who publicly worked for and advocated "right-to-work" laws in contravention of the expressed official policy of the union.[20] Although the members thus expelled had not lost their jobs as a result, the District Court of Appeal reversed the decision below. The Court of Appeal began by first dispelling the illusion "that unions are purely voluntary organizations like Republicans, Democrats, Elks, and church groups," 16 Cal.Rptr. at 814, relying on the work of Professor Summers and saying, "It is this omnipotent analogy that leads the courts astray." The court then went on to advert to the many detriments which would accrue to the expelled member, saying, " * * * [I]t cannot be assumed that the only value in membership is job retention." 16 Cal.Rptr. at 815. Coming to the crucial question of whether the union would be permitted, under the facts present there, to penalize a member for engaging in political activity which the union opposed, the court listed five considerations which governed the question. 16 Cal.Rptr. at 817. Speaking of the importance to the community of the individual's untrammeled right to express himself on political questions, the court said, 16 Cal.Rptr. at 818:

" * * * [F]ew subjects in the history of western civilization have drawn such a unanimity of support.

In a dissenting opinion Mr. Justice Brandeis observed, "The right of a citizen of the United States to take part, for his own or the country's benefit, in the making of federal laws and in the conduct of the government, necessarily includes the right to speak or write about them; * *. Full and free exercise of this right * * * is ordinarily also his duty; for its exercise is more important to the nation than it is to himself.' Gilbert v. State of Minnesota, 254 U.S. 325, 337–338, 41 S.Ct. 125, 129, 65 L.Ed. 287. In Sweezy v. State of New Hampshire, 354 U.S. 234, 250–251, 77 S.Ct. 1203, 1212, 1 L.Ed. 2d 1311, it was said, 'Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association. * * * History has amply proved the virtue of political activity by minority, dissident groups, who innumerable times have been in the vanguard of democratic thought and whose programs were ultimately accepted. * * * The absence of such voices would be a symptom of grave illness in our society.' Further quotation is unnecessary. *Suffice it to say that the unlimited freedom to express political views is the very heart of a democratic body, pumping the lifeblood of ideas without which our system could not survive.*

" * * * [E]xpulsion cannot serve to quiet the individual. It can only serve to intimidate those who remain." (Emphasis added.)

The Court there concluded that it was clear that, at least where the political activity of the member was not patently in conflict with the union's best interests, the union should not be permitted to use its power over the individual to curb the advocacy of his political views. 16 Cal.Rptr. at 819–820.

The previously quoted statements by Professor Cox and the three state courts

20. The decision of the trial court was criticized in Note, 74 Harv.L.Rev. 624 (1961).

are all of poignant significance here. In early 1960 the various factions in Local 386 were in strong dispute over wage negotiations. See Finding of Fact No. 4. It is understandable that these Petitioners were concerned about their daily bread. Who is not? The point is not whether they were right or wrong from an economic point of view. The point is that the rights of these Petitioners to dissent, to hold meetings in their private homes to discuss their views, to organize a slate of candidates in opposition to the incumbent officers, and to argue vigorously for their views without fear of reprisal are rights of the highest order.[21] Even if the writers and the state courts did not think so, the judgment of the Congress stands as an unequivocal testimonial to the value of freedoms which this Court is charged with protecting. As the Senate Report said, "It needs no argument to demonstrate the importance of free and democratic union elections." S.Rep. No. 187, 86th Cong., 1st Sess. 20 (1959).

The precise problem presented by this case seems pinpointed by Summers, Union Powers and Workers' Rights, 49 Mich.L.Rev. 805, 820 (1951), where the author said:

"The rights which a worker should have in the union which acts as his economic government are essentially the rights of a citizen in a democratic state. * * * Most important is the right to participate fully and freely in making the laws under which he lives. *If this right of an individual worker within his union is not protected, then collective bargaining has not brought him freedom but an additional master."* (Emphasis added.)

These words are of vital significance here. Their importance is illustrated by examining the position in which these Petitioners now stand. The GEB has sown doubts in their minds—and perhaps the minds of others—as to the strength of their supposed Federal rights. Their quandary is a dire one: They looked in vain to the GEB for redress of their wrongs and now that same body has told them that Local reimbursement for resort to the courts is contra to Union policy. This will not do. Congress has not only grown weary of this sort of thing; Congress has been outraged by abuses of power held by those unconcerned with the fiduciary responsibilities imposed upon them. Congress has completely lost faith in benevolent dictatorships. To paraphrase Professor Cox, Congress has decided that it is not enough to put our trust in self-restraint.[22] Congress has taken steps to secure the rights of the union member and these rights cannot be impaired, even if the method is subtle and the injury is slight. Congress passed the L.M. R.D.A. to eliminate, inter alia, tyranny by union officials and disregard of the rights of individual union members. There has perhaps been little outright tyranny here, but tyranny would soon be possible if insidious policy declarations such as presented here were allowed to

21. "The law cannot make unions democratic but, by protecting the right of dissent, it can make the institutional soil less barren." Summers, The Role of Legislation in Internal Union Affairs, 10 Lab.L.J. 155, 156 (1959). At 160 it was further said, "The most crucial step in making unions responsible centers of power and strengthening their own internal process of self-control is protection of democratic rights within the union. The right of union members to protest against union policies encourages change from within. The right to accuse officers of dishonesty, breaches of trust and dictatorial methods helps deter such abuses. The rights to form opposition groups within the unions, campaign for office and have honest elections increase the ability of unions themselves to oust tyrannical and predatory leaders. Democracy does not insure purity, for union members may tolerate abuses and elect scoundrels, but guaranteeing these basic rights will substantially reduce the need for extensive intervention in union affairs. Legal protection of these rights thus helps limit governmental control, and thereby preserves and promotes pluralism."

22. See fn. 16 supra.

stand. These Petitioners would certainly feel that the power emanating from Lafayette, Indiana,[23] was superior to the power in Washington, D. C. There is no need to ponder whether more harassment and coercion *would* follow here; it is enough that these Petitioners and others like them would have less will to resist in the future if this policy declaration was allowed to stand. If it be suggested that the protection accorded reaches too far, it can be replied that prior decisions might well have gone further under the guise of conventional rationales. See Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L.J. 175, 181–84, 192–96, 198–200 (1960).[24] In any event, these are important rights; it is proper to take alarm at the first indication that they are being infringed. Cf. Engel v. Vitale, 370 U.S. 421, 436, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962).

■■■ At the risk of oversimplification the question might now be rephrased: Can the national governing body of a union discourage resort to the federal courts when internal redress for patent federal wrongs has proven futile in the past? The answer is no. The reason is that otherwise federal rights would be frustrated. That is the crux of the narrow issue at hand; that is why the letter of November 15, 1961, must be struck down. The GEB and Congress have moved in opposite directions—the latter to secure certain rights and the former to frustrate them. These conflicting policy choices cannot stand together. This being so, there can be no doubt that the policy carefully expressed by Congress is superior to the wisdom of a handful of Union officials far removed from the actual controversy. Public policy has traditionally been paramount in our legal system. This case certainly does not call for the disregard of that rule.

This letter from the GEB was the only real defense which these Respondents had, and they do not have it anymore. Any oral orders which they might have received from higher officers must share the same fate as the GEB's policy statement. There is some question here whether these Respondents were actually

23. The general offices of the Brotherhood of Painters, Decorators and Paperhangers of America, AFL-CIO, are located in Lafayette, Indiana. The letters from the General President and the General Executive Board were directed from that address.

24. "A large proportion of the litigated discipline cases have at their roots a factional fight within the union, and in many it is reasonably apparent that the discipline is directed toward curbing criticism and political opposition. The contract theory, woodenly followed, gives no protection against such discipline, for union constitutions commonly contain provisions circumscribing political activity within the union. * * *
"The courts, however, have not proven themselves so wooden. Although they did not, prior to Madden v. Atkins, explicitly declare that freedom of speech and assembly within the union could not be impaired by union discipline, they freely manipulated the flexible doctrines to achieve that end. Polin v. Kaplan (257 N.Y. 277, 177 N.E. 833 (1931)) is itself a classic example. While restating the contract theory and studiously avoiding any holding that free criticism was beyond the reach of union discipline, the court shriveled constitutional provisions, ignored significant portions of the charges, and refused to accept the union's findings of fact, all to the end of protecting those who dared to exercise their democratic rights. Out of forty litigated cases discernably involving discipline for internal political activity, the courts have voided the discipline in all but ten cases. *Inarticulate the courts have been, insensitive they have not.*" (Emphasis supplied). Summers, supra at 192–93. At 199 it was further said, "The conduct which has in fact received the broadest judicial protection is the exercise of democratic rights within the union. The courts have envisioned unions as democratic institutions, and though seldom articulate, have bent the theories, case by case, to place freedom of speech and assembly beyond the reach of union discipline. This basic pattern, long obscured by contradicting language which may have deceived even the judges who used it, is now made explicit by Madden v. Atkins."

relying on these various letters and oral orders, but it can be assumed that after the letter of November 15, 1961, arrived the Respondents actually felt bound by it. It is the Respondents' role in the entire transaction which is important. This case nominally involves the alleged breach of a fiduciary duty and the non-payment of attorneys' fees, but what is really at stake here are the rights which were jeopardized by the union trials of July, 1960. These Respondents were involved in meting out unfair treatment to these Petitioners in those trials. To allow this policy declaration to stand and the Respondents to prevail would possibly subject these Petitioners to more unfair treatment. In any event, it would tend to seriously undermine Title I of the L.M.R.D.A. Without regard to whether the conduct of the Respondents in the first union trials was a breach of their fiduciary obligation, it seems clear that that obligation has been breached since then. These Respondents may not have requested this particular letter, but they were in communication with the General President and the GEB. Both the General President and the GEB seem to have been responsive to these Respondents' pleas. However, there is no need to ponder whether the GEB favored one side or the other. The letter of November 15, 1961, may well have been sent in good faith; it does not matter. The letter must be set aside. Without regard to whether the letters from the General President and the GEB should have been obeyed before this decision, those letters certainly should not have been solicited. Local 386 told these Respondents to execute certain checks. That command should have been obeyed; it has not been obeyed. The Respondents have therefore violated their positions of trust within the meaning of Section 501(a) of the L.M.R.D.A.

This Court feels that the overall thrust of the L.M.R.D.A. is so strong and the legislative history so clear in support of the proposition that abuses of union power must be stopped, that this case could be decided without any assistance from other state or federal cases. However, there have been many state court cases in this general area and many able commentaries which fully explain their precise meaning. There have also been several very important federal decisions which this Court feels are significant here in various ways. All of these cases have involved judicial intervention into the internal affairs of labor unions. All of these cases resulted in the courts setting aside various actions which had been taken by the unions. Some of the unions were locals; some were the national governing bodies similar to the GEB in this case. The complexity and detail of some of these cases requires that they be carefully examined separately.

The previously cited case of Highway Truck Drivers and Helpers Local 107 v. Cohen, 182 F.Supp. 608 (E.D.Pa.1960), aff'd 284 F.2d 162 (3rd Cir.), cert. denied, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed. 2d 744, is important because it is the first case to expressly construe Section 501 of the L.M.R.D.A. Cohen took two alternative paths to the same result, which was the enjoining of payment with union funds of attorneys' fees for officers charged with criminal and civil violations of the L.M.R.D.A. The first approach was to view the Union constitution as a contract between the organization and its members and then hold that the payment of attorneys' fees was an ultra vires act under the circumstances present there. The second approach was to reason that the payment of attorneys' fees was inconsistent with a policy of the L.M.R.D.A., which had an express purpose of eliminating improper practices. The Cohen case is important here for two reasons.

## III. JUDICIAL INTERVENTION IN THE INTERNAL AFFAIRS OF UNIONS

The first significance of the Cohen case lies in its illustration of what might be called the problems of judicial intervention in union affairs. At 182 F.Supp. 618 the Court said, " * * * the courts have been reluctant to interfere in the

internal affairs of a union. Underwood v. Maloney, D.C.E.D.Pa.1957, 152 F.Supp. 648." The Respondents have certainly asked this Court to be reluctant here.[25] The Respondents have argued that the matter should be left to the state courts. In the numerous hearings held in this case the advantages and benefits to be gained from a trial of this matter in the state courts have been extolled in glowing terms. The Respondents' outspoken desire to get out of this Federal Court has been exceeded only by their articulated zeal to get into the state courts and proceed with the litigation (In fact, this Court was originally persuaded by these and similar arguments.) But without regard to the express terminology employed, the meaning has been clear: The Respondents would be happy if this Court

did not step into their Union's affairs. What is more important is that another District Court has refused to intervene in a somewhat similar case involving Section 501, adverting to the courts' traditional reluctance to intervene in union affairs.[26]

■ It may very well be that state courts have traditionally been loathe to intrude into the internal affairs of unions.[27] It may very well be that federal courts have been equally reluctant, even since the enactment of the L.M.R.D.A.[28] However, insofar as the quoted statement from the Cohen case suggests that there is something sacrosanct about a union's internal affairs, it is the belief of this Court that internal affairs of unions should be readily examined when

25. On page 4 of the most recent brief filed by the Respondents it is said, after a description of the three Federal actions which this union has generated, "Surely, nothing could more clearly show the impropriety of embroiling the Courts of the United States in such petty factional disputes than this dreary catalogue of events."

26. Penuelas v. Moreno, 198 F.Supp. 441, (S.D.Cal.1961) (held Petitioners had not exhausted internal remedies). 198 F. Supp. at 448 the Court said, "As observed by the court in Smith, 181 F.Supp. 14, at page 19, supra, and in cases too numerous for citation, the court will not interfere in internal union affairs except in rare instances. * * *" The holding in the Penuelas case has been noted with apparent approval in Edsberg v. Local Union No. 12 of Int. Union of Operating Engineers, 300 F.2d 785, 787 (9th Cir., 1962), questioned in Deluhery v. Marine Cooks and Stewards Union, AFL-CIO, 199 F.Supp. 270, 274 (S.D.Cal.1961) (excellent discussion of leading appellate case on exhaustion of remedies under Section 501), and flatly rejected in Holdeman v. Sheldon, 204 F.Supp. 890, 896 (S.D.N.Y. 1962), where the Court said, "This court sees no warrant for engrafting this requirement on § 501(b), * * *"
For a disapproving commentary on the Smith and Penuelas cases, see Note, Rights of the Union Members: The Developing Law Under the LMRDA, 48 Va. L.Rev. 78, 92–93 (1962). See also Summers, Legal Limitations on Union Discipline, 64 Harv.L.Rev. 1049, 1086 (1951).

27. "[T]he courts have a deep-rooted reluctance to intervene in the internal affairs of voluntary associations. This reluctance is a product of long judicial experience in attempting to settle family fights in religious and fraternal associations. The courts have recognized that they have no workable standards for refereeing disputes based on obscure doctrines within a church, or for judging the virtues of cliquish factions within a lodge. Any order which the court may issue will not heal the schism, but will only embitter the fight. The dispute seldom involves anything but wounded dignity, and the award serves only to soothe the feelings of one of the parties. This policy of non-intervention which the courts developed in cases involving churches and lodges was early applied with equal strictness to labor unions. Although the modern labor union, both in structure and function, bears little resemblance to these other voluntary associations, a traditional reluctance to interfere still remains an underlying attitude in the minds of the judges." Summers, Legal Limitations on Union Discipline, 64 Harv.L.Rev. 1049, 1050–51 (1951).

28. Examination of the case of Underwood v. Maloney, supra, suggests it might have been cited too generally in the Cohen case. The court there made it clear that "the courts do not hesitate to interfere" where union trials or appeals are conducted without due process to the accused individuals. 152 F.Supp. at 661.

258

the purposes of the L.M.R.D.A. require it.

The position of this Court is based on several premises. First, there is some doubt as to just how reluctant the state courts have been to step into the internal affairs of unions. The work of a competent scholar suggests that the state courts may well have been more vigilant with respect to the individual union member's rights than has generally been supposed. See e. g., Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L.J. 175 (1960). Indeed, the three state decisions previously quoted in part may well only be articulate examples of what other courts have long been doing under the guise of more conventional rationales.[29] If the courts have been reluctant,[30] it does not necessarily follow that they have not ultimately given relief when they deemed it necessary.[31] If they have talked about their reluctance, it does not necessarily follow

29. "The courts commonly protect democratic rights by warping the constitution to fit their needs. The right to voice and vote has been read into the constitution, and clauses prohibiting conduct tending to cause disruption have been narrowed so as not to reach accusations against the officers for diversion of union funds." Summers, Judicial Settlement of Union Disputes, 7 Buffalo L.Rev. 405, 418 (1958).

30. "The first point of judicial indecision is whether to intervene in internal union affairs. The traditional doctrine of non-intervention borrowed from cases involving religious societies and fraternal orders, is a recurrent theme in court opinions. This reluctance to intervene is real. It is born of tradition and feeds on misplaced precedents, but it also gains strength from less articulate, but more relevant, considerations. Autonomy of private groups is an essential element of our pluralist democracy. Intervention in internal affairs reduces that autonomy and creates a spectre of close legal control which would make private groups adjuncts of an all-powerful state. *Fearful of this end, the courts intuitively resist involvement.* Combined with this is the courts' uncertainty as to their competence to regulate the complex relationships within the union or their ability to supervise the union's internal operation." (Emphasis supplied). Summers, The Impact of Landrum-Griffin in State Courts, N.Y. U. 13th Annual Conf. on Labor 333, 338 (1960).

31. *"Most courts, however, recognize that refusal to intervene is at times intolerable, if not impossible.* As the New Jersey court said in another election case, 'A group could perpetuate itself in office by the tactics attempted here unless the Court of Chancery has power to intervene.' Other courts have not stood idly by while incumbent officers disqualified candidates, refused to hold elections, or falsified returns. The court must intervene and adjudicate the dispute. The alternatives are to give the imprint of legality to those who hold the emblems of union authority, or to leave the claimants to battle for possession of the union hall. In expulsion cases, the court must review the propriety of the union's action or leave union tribunals wholly unchecked; and in trusteeship cases the alternative to judicial action is to give victory to the one who is able to seize the spoils.

"The courts' compulsion to intervene is strengthened by the conviction that substantial rights are involved. The right to membership, the right to vote, and the right to run for office have all been labeled 'property rights.' This is but a verbal device to assert them worthy of judicial protection, and few courts are misled by the intangible nature of the rights to find them insubstantial. Indeed, most courts now feel no need even to use the bootstrap label, for there is common awareness of the special status of unions and their role in regulating the terms and conditions of employment. Judges, confronted with an internal union case, know that the interests are of great value to the parties, and may sense that society has a significant concern in the outcome. The doctrine of non-intervention becomes an admonition instead of a binding rule.

"The courts' willingness to intervene is encouraged by the unions themselves, for although they vigorously argue that courts should stay out of internal union affairs, they are among the first to seek judicial aid. International unions sue to recover the treasuries of seceding locals, and local unions seek to enjoin the imposition of trusteeships. Declaratory judgment actions are brought by officers to determine who is a qualified candidate or to validate their own election. Unions which limit the members' right to sue the union are found hauling their members into court to collect unpaid fines and dues. Non-intervention is thus made to look less like

that they have practiced what they preached.[32] The truth of the matter is that the Court in the Cohen case was under no hypnotic spell when it duly recited what Professor Summers calls the "litany of reluctance"[33] to interfere in union internal affairs. After the solemn incantation of the ritualistic words the Court there moved with considerable ease into the middle of that union's internal affairs.[34] What was said must be compared with what was done. It is also worth noting that no higher court took issue with what was done. Highway Truck Drivers and Helpers Local 107 v. Cohen, 182 F.Supp. 608 (E.D.Pa.1960), aff'd 284 F.2d 162 (3rd Cir.), cert. denied 365 U.S. 833, 81 S.Ct. 747, 7 L.Ed.2d 744. However, it has been argued that it might be more accurate—and less dangerous[35]—to say simply that courts carefully study all the facts and weigh a variety of factors before intervening in the internal affairs of unions. See Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L.J. 175, 223–24 (1960).

Second, there is a vast difference, as has already been pointed out by the Ohio and California courts, in labor unions and "purely voluntary organizations like Republicans, Democrats, Elks, and church groups." Mitchell v. International Ass'n of Machinists, 196 Cal.App.2d 796, 16 Cal.Rptr. 813, 814 (1961), petition for hearing denied, No. 24913, Cal.Sup.Ct.

a principle than a lawyer's opportunistic argument." (Emphasis supplied.) Summers, The Impact of Landrum-Griffin in State Courts, N.Y.U. 13th Annual Conf. on Labor 333, 339–341 (1960).

32. "If one looks beneath the skin of language in internal union cases and examines the behavior of the courts, it is clear that judges are struggling to define their role in regulating internal union affairs. They doubt the propriety of legal intervention and their special competence to regulate, but, confronted with concrete cases, they must decide or let valuable rights go by default. They seek to limit intervention to applying the union's own rules, but some of these prove intolerable and the courts must superimpose their own standards. The uncertainty as to what those standards should be feeds back on the reluctance to intervene and the desire to limit intervention. *In the end the courts do decide the cases and the majority inject their own values while disclaiming the role they in fact play.*" (Emphasis supplied.) Summers, The Impact of Landrum-Griffin in State Courts, N.Y.U. 13th Annual Conf. on Labor 333, 349–50 (1960).

33. "This is more than empty psalm-singing: it reflects a deep-seated desire to avoid involvement." Summers, Judicial Settlement of Internal Union Disputes, 7 Buffalo L.Rev. 405, 407–408 (1958). At 423–24 it was further said, "The reluctance to intervene has its roots in our concept of a pluralistic society in which state centralism is prevented by a distribution of power. Unions and other private organizations play a vital role in this distribution of power, but they can not fulfill this function if legal controls make them but arms of the state. On the other hand, distributed power can not be left wholly unchecked lest pluralism repudiate democracy and disintegrate government. The reconciling of these two competing demands is the central problem in determining the standards to be used in settling internal disputes. That reconciliation is now being made by the courts with no evident awareness of the import of their action."

34. Professor Summers argues that the "ritualistic repetition" of this sort of statement "serves only as penance for its transgression." Summers, Judicial Settlement of Internal Union Disputes, 7 Buffalo L.Rev. 405, 409 (1958).

35. "Monotonous drumming of the tired slogan that the law should keep out of internal union affairs has deadened awareness of problems which can not be wished away. The law must intervene in union disputes. The alternative is either to abdicate to brute force or to ratify the exercise of arbitrary power." Summers, Judicial Settlement of Internal Union Disputes, 7 Buffalo L.Rev. 405, 423 (1958). "In any particular case it makes little difference how the court rationalizes its result, but the application of artificial criteria can serve to mislead less perceptive judges in later cases. Such a solution creates the positive danger that other courts, particularly lower courts in the same jurisdiction, will read the decisions, and, seeing what has been said, will be unable to see what has been done." Summers, Legal Limitations on Union Discipline, 64 Harv.L.Rev. 1049, 1073 (1951).

(1962). This difference in a union and other voluntary associations has been commented upon in Summers, Union Democracy and Union Discipline, N.Y.U. 5th Annual Conf. on Labor 443, 459–460 (1952), where it was said:

"A union, however, is not a voluntary association. A worker does not have a free choice whether he shall come within its power, nor can he readily escape its reach. The union as bargaining agent represents all employees in the unit, whether they are members or not. It helps determine for each and every one his hours, his wages, his seniority, his vacation and his retirement. A worker does not voluntarily submit himself to its control, but is bound by its decision regardless of his choice. His only escape is to quit his job and seek work elsewhere— and be governed by another union! Unions are not only involuntary associations but obtain a substantial measure of their compulsory jurisdiction over individuals from the law itself. Labor relations acts, both federal and state, compel the employer to give the union exclusive bargaining rights, and the individual is legally barred from asserting his independence."

These reasons persuaded the California court to protect the freedom of the union members in the Mitchell case supra, and these same considerations among others may well have the underlying reasons for the protection which the commentators assert has actually been given in most of the state decisions. It is likely that these factors will persuade other state courts in the future to give overt or covert protection to the union member's rights.

The third reason for this Court's position is that Congress obviously was not content with the protection that was being given and they did not wish to wait for the state courts to become enlightened by one means or another. Senator Kennedy was not in favor of inserting a bill of rights for the union member into the labor reform statute being contemplated. The Kennedy-Ervin bill, S. 1555, 86th Cong., 1st Sess. (1959), did not contain any such measure. Senator Kennedy was adamant in his position that the union member was being accorded adequate protection in union tribunals and in the courts. When Senator Carroll asked him whether he was referring to the State courts, Senator Kennedy replied, 105 Cong.Rec. 5821 (daily ed. April 22, 1959):

"Yes, State courts. I quote Prof. Clyde W. Summers, of the Yale Law School, probably the outstanding authority in the country on union discipline. In an article published in the Harvard Law Review for May 1, 1951, Professor Summers said:

"The courts have reciprocated by looking with a jaundiced eye upon all discipline which restricts the member's freedom to use the judicial process and, in these flagrant cases, have freely protected the individual member from discipline. Even in more doubtful cases in which members have sought to enjoin the levying of assessments or the calling of strikes on the claim that the union action was unconstitutional or illegal, the courts have given full protection.

"Professor Summers then cites numerous cases in which the civil courts have protected political activities outside unions, political activities inside unions, dual unionism and so forth.

"I suggest that any Senator who is concerned about whether there have been voluminous laws and decisions in the States which have the force of precedent should look at the cases which are included in this article, which show the broad protections which are given to union members by State courts for any breach of their right to speak, against being expelled from unions, and against excessive fines."

In short, Senator Kennedy told the Congress about what Professer Summers was saying and what the state courts were doing. The reply of Congress was blunt and to the point. It enacted a federal bill of rights for the union member. Congress perhaps did not want the union member to have to read about his rights in the Harvard Law Review. Congress perhaps thought that the United States Code would be more accessible—and more convincing.[36] But if there is doubt about what the Congress was thinking, there is none about what it did. It enacted legislation aimed squarely at the internal affairs of unions. The Congress was concerned with what the McClellan Committee had uncovered; it felt that there was a relationship between the internal affairs of unions and the over-all welfare of the country. See e. g., H.Rep. No. 741, 86th Cong., 1st Sess. 6–7, 15–16, 77–78 (1959). As it has been pointed out in Summers, The Impact of Landrum-Griffin in State Courts, N.Y.U. 13th Annual Conf. on Labor 333, 334 (1960):

"The first and most elementary premise [of the LMRDA] is that the public has an interest in the internal affairs of unions. The cherished myth that the way unions conduct their internal affairs is no one's business but their own has been destroyed; and the label of 'private association' no longer serves as a 'no admittance' sign to legal intervention. Not only is public filing of financial reports required, but the law affirmatively protects certain rights of membership, regulates elections, imposes qualifications for offices, and guards local autonomy. This premise did not spring fully

armed from the mind of McClellan, for the public interest has long-growing roots reaching back at least to the Wagner Act of 1935 which gave unions the statutory authority of exclusive bargaining representatives. Having vested unions with such status, the public inevitably had an interest in their internal affairs, and the statute now articulately affirms that public interest."

The final reason for this Court's position is also found in the LMRDA. The Congress did not merely say it would be very nice if union officials would be a little more careful in the future about the rights of the downtrodden union member. The Congress told the federal courts to protect these rights. As observed in Summers, supra, at 336:

"The third basic premise is that the most appropriate agencies of government to protect these democratic rights are the courts. Enforcement through an administrative agency was explicitly rejected, except for financial reports. The Secretary of Labor has a limited role in trusteeship and election cases, but this is at most the role of a public prosecutor who brings claimed violations before the courts for judicial determination. Critical provisions of the statute, not only in the Bill of Rights, but in the titles dealing with trusteeships, elections, and fiduciary obligations, are stated in broad general terms. On the court is placed the responsibility to give these meaning and to spell out the limitations. This is to be done through the normal judicial process, and the rights enforced by tradi-

36. Senator Mundt said, 105 Cong.Rec. 5823 (daily ed. April 22, 1959), "I also wish to say, in response to the statement by the Senator from Massachusetts [Mr. KENNEDY], who quoted from a very eminent college professor of Yale University, who wrote an article pointing out that there were many laws and many provisions protecting trade union members in their rights, that this undoubtedly is accurate and is a beautiful theory, but for more than 24 months our committee has been investigating violations which occur under the laws and rules which now prevail. Man after man has been before the committee to complain about the fact that he has been intimidated, that he has been beaten up, that there has been violence against his property or against his person, and so on, simply because there is not now adequate protection in the law, either at the State level or the Federal level."

tional judicial remedies. The statute thus declares the competence of the courts to develop, apply, and enforce the law concerning the democratic rights of union members.

"Whether these premises represent sound policy is not now the question, for the statute is a stubborn fact and these premises are now the law of the land."

*If* the courts have been reluctant to interfere in the internal affairs of unions as well as the above mentioned purely voluntary organizations, it therefore seems clear to this Court that Congress wished to rectify any reluctance that federal courts might have insofar as unions were concerned. As Professor Summers pointed out supra at 350, "The statutory premises undercut the very roots of the courts' reluctance to intervene."

## IV. FURTHER ELABORATION ON THE FACTORS WHICH AFFECTED JUDICIAL INTERVENTION IN THIS CASE

Returning to the Cohen case it is observed that the Court there first grappled with the problem in terms of whether the action taken was ultra vires. The same terminology could be employed here. On the one hand it could be asserted that the payment by Local 386 of these Petitioners' attorneys' fees was an ultra vires act. Indeed the policy statement of the GEB is practically the same thing as a declaration that the action taken was ultra vires. On the other hand, it could be decided that the action taken by the Local was not ultra vires and that the action taken by the GEB was a breach of the contract embodied in the constitution. However, it would seem that the question is whether to allow the GEB—in this case—to exercise the power that it would otherwise have to make such a statement as this. The question here seems to be one of favoring strong control of unions by high officials on the one hand or union democracy on the other. A decision here that the GEB has the unquestioned power at all times to discourage resort to the

courts would be supported by the views of those who feel that a labor union should be strictly regimented. This position is discussed in Cox, Law and National Labor Policy 93 (1960), where the author said:

"According to one view, labor unions should be regarded as military organizations for their function is to wage economic warfare with employers who are constantly feeling out chinks in the union's defenses through which to wound if not to destroy them. As a wartime army can neither brook divided leadership nor tollerate active dissidents, so must a union punish· the troublemakers in order to close ranks against employers and rival organizations."

The author went on to state that he preferred the view that enlarged and preserved union democracy. Another writer has adverted to the problems inherent in striving for union democracy. Summers, Union Powers and Workers' Rights, 49 Mich.L.Rev. 805, 817–18 (1951):

"We must recognize that the economic soil from which unions spring has been almost barren of democratic processes. Management's labor policies have never been democratically controlled. * * * When we demand that unions, which sit across the table from managment, maintain democratic procedures, we are demanding a double standard. We seek flowers where only weeds have grown.

"An obvious obstacle to union democracy is that the union has to maintain itself in a climate which is hostile to its existence and its objectives. * * * The state of siege, ·the cold war and the strike do not provide a healthy climate for the growth of democratic processes."

The author there went on to assert that there are more compelling reasons why unions should be democratic. A number of the state courts as well as the Congress

have outspokenly concurred in this latter view. As the same author has elsewhere stated, Summers, The Impact of Landrum-Griffin in State Courts, N.Y.U. 13th Annual Conf. on Labor 333, 335 (1960):

> "The second basic premise of the [LMRDA] is that unions should be democratic. All of the elaborate arguments that union democracy was unnecessary, unworkable, or even unfortunate have been deliberately rejected. Financial integrity is not enough; the decisions as to dues and expenditures must be democratically made. Officers must be more than honest and responsible; they must be chosen by the members in an open election after free debate. Union members are guaranteed equal rights, freedom of speech and assembly, and due process within the union. Although the statute leaves undefined the exact amount of individual right to be protected, and cannot guarantee the full realization of the democratic process, the policy thrust of the statute is clear and strong. The public has an interest in union democracy."

The same author has developed the above thesis in more detail in Summers, The Public Interest in Union Democracy, 53 NW.U.L.Rev. 610 (1958). A persuasive discussion is concluded in part with the following, supra, at 624–25:

> "The union movement has become one of the most significant institutions in our society. It was the product of democratic fervor, born and nurtured for the purpose of bringing into industry a greater measure of personal freedom and personal dignity. Its instrument of industrial democracy was collective bargaining through which workers gained a voice in determining the rules which governed their working lives.

> "Unions through collective bargaining exercise an unsurpassed power over the lives of their members. This power is regulatory and compulsory, reinforced by legal protection, recognition and authorization. This power is granted because of the public interest in collective bargaining, but collective bargaining can not survive in full vigor unless it fulfills its purpose of contributing to our democratic way. This purpose can be fufilled only by democratic unions."

Enough has been said about the general framework of the statute. It is time to probe more deeply into the work of the McClellan Committee, whose shocking findings were the impetus of the L.M.R.D.A.'s enactment in 1959.

The entire thrust of the first report of the McClellan Committee is in support of the proposition that unions should be democratic. See Interim Report of the Select Committee on Improper Activities in the Labor or Management Field, S. Rep.No.1417, 85th Cong., 2d Sess. (1958). The McClellan Committee undertook an intensive study of the need for labor reform legislation which is described in the foreword to the first interim report. The testimony heard by the committee and discussed in the first report directly involved five unions. The findings in regard to three of these unions seem relevant to the problem presented by this case. The first union which was directly reported upon was the Bakery and Confectionery Workers International Union of America. The president of this union played a starring role in the findings.[37]

37. "As one of the oldest organized labor groups in our national life, the Bakery and Confectionery Workers International Union of America has witnessed many a historic moment in labor's climb up the economic ladder. After its own 72 continuous years in existence, the union should by now have reached new peaks of progress. Such, however, is not the case.

"Instead, retrogression has been the bakers' lot, a grim fact directly traceable to the ruinous stewardship of International President James G. Cross.

"Stewardship is, in fact, a misnomer for the Cross brand of administration, for it implies accountability, of which the bakers have had less and less, to the vanishing point, since Cross took over in 1953. In

The report begins at page 106 of the Interim Report supra and some of the findings beginning at page 128 are as follows:

"7. The committee finds that Cross sanctioned the use of violence to discourage dissents within the union and alleged obstructionists without, including the beating of the 14-year-old son of a bakery owner during a Los Angeles strike. Cross himself was charged by two witnesses with having taken part in the slugging of union critics at the time of the union convention in San Francisco in October 1956. A grand jury, although it took no action in the case, described it as 'rampant with perjury,' and the district attorney flatly proclaimed his disbelief of Cross' denial that he was present at the time of the beatings.

"8. The committee finds that at this same convention Cross railroaded through changes in the union constitution which destroyed any vestigial pretenses of union democracy. Among the powers which he thus arrogated to himself were the right not only to select but to remove international representatives, who constituted 75 percent of the union's executive board; the sole right to approve banks in which union money was to be deposited; the sole authority to direct the secre-

tary-treasurer to prepare checks. Cross also arranged that his own salary and that of his secretary-treasurer, previously set by the convention, should now be set by the executive board, three-quarters of whose salaries he himself fixed; and in an orgy of mutual admiration immediately after the convention these lackey lieutenants voted him a salary raise from $17,500 to $30,000, and Cross shortly returned the favor by raising their salaries.

"9. The committee finds that other actions and statements by Cross at the convention nakedly exposed an authoritarian philosophy abhorrent to legitimate American unionism. Under his callous direction use of the secret ballot to elect international officers was abandoned, thus further intimidating possible dissentters; the use of parliamentary procedure at the convention was jettisoned after a haughty pronouncement by Cross that it was not made for bakers and confectioners; financial reports, once given to the membership in full every 3 months, were henceforth to be given to them in summary every 6 months."

The report indicates that the president of this union personally demolished union democracy at the national level and insured its demise at the local level by the use of tyrannical trusteeship.[38] The

---

its place they have had doubletalk and dishonesty; their constitution has been abused and perverted; their hard-earned funds have been plundered; tyrannical and swindling trusteeships have crushed their local freedoms.

"As an examplar of a labor autocrat, Cross, in the opinion of the committee, conjures up few rivals. Such has been his cynical and rapacious grasp on the bakers union that in all the misdeeds uncovered by the committee's hearings he seldom plays other than a starring role; in the instances when he does not, his hand-picked henchmen do. The committee is of the emphatic belief that the culpability of James G. Cross is central to the corrosion of the bakers union. * * *" Interim Report, op. cit. supra, at 128.

38. "12. The committee finds that the trusteeship principle itself was thoroughly abused in practice. Designed to safeguard union members' interests, trusteeships as applied by international officers of the bakers not only depredated the funds but despoiled all democratic rights of the rank and file. Voting on matters of local interest ended; local officers, board members, and shop stewards ceased to function, and in their place were installed aides in every way subservient to the trustee. Even when trusteeships were removed, locals lived under the threat of their reimposition. The simple act of filing of new charges against the local by someone in the international office or by only one local member would do the trick, an easy one among people riddled with fear of their

AFL–CIO did not stand idly by while all this was going on,[39] but its sanctions undoubtedly were of little solace to the beleaguered individual within the union.

The second group of findings which seem relevant to the problem in this case are those concerning the International Union of Operating Engineers; which are in part as follows, Interim Report, op. cit. supra at 437:

"In the American labor movement the International Union of Operating Engineers stands out as an ugly example of ruthless domination of working men and women through violence, intimidation and other dictatorial practices.

"The hearings of this committee concerning the activities of the operating engineers union clearly demonstrated the lack of democratic procedures within that union and exposed to public view the ruthless ends to which the union's leadership will go to stifle any semblance of democratic action.

"The hearings revealed, in the committee's opinion, these salient facts:

"1. Democracy within this vital union is virtually nonexistent. Through an international constitution designed to give the membership as little voice as possible, only 46 percent of the union's 280,000 members are even allowed to vote for their own officers. Where elections are held, union leaders have shamefully deprived their members of their democratic rights through the indiscriminate stuffing of ballot boxes and rigging of elections.

"2. Trusteeships have been imposed—for no apparent reason—as a means of continuing domination over the affairs of a number of locals of the International Union of Operating Engineers. The locals under trusteeship have been looted and their members deprived of their rights. Two locals in Chicago, Ill., have been under trusteeship for 29 years.

"3. There has been extensive collusion between union officials and management which has resulted in the emergence of a class of 'favorite contractors' who, testimony showed, were permitted to pay lower wages and ignore other established contractual arrangements.

"4. Union officials have entered into business arrangements with the very employers with whom they negotiate in what the committee feels are clear conflicts of interest.

"5. Vast amounts of union funds have been misused and diverted to the personal profit of union leaders for their extravagant entertainment and luxury. Interim Report, supra, at 437–38."

Findings of this sort led the McClellan Committee to conclusions falling into eleven categories, Interim Report, supra, 4–7, some of which were as follows, p. 4:

"The overall conclusions of the committee are as follows:

"(1) There has been a significant lack of democratic procedures in the unions studied.

"(a) Constitutions have been perverted or ignored.

"(b) One-man dictatorships have thrived.

"(c) Through fear, intimidation, and violence, the rank-and-file member has been shorn of a voice

superior officers." Interim Report, op. cit. supra, at 130.

39. "The committee notes with satisfaction that subsequent to its hearings the AFL-CIO expelled the Cross union on charges of corruption. Thus did a once-proud body of laboring men fall victim to the cynical self-interest and amoral acts of one individual, for there is no doubt that James G. Cross himself singlehandedly wrecked the union which had reposed its trust in his hands. The price is a heavy one for the bakers to pay, but only by such drastic action can the decent rank and file come to a full realization of their betrayal." Interim Report, op. cit. supra, at 131.

in his own union affairs, notably in financial matters.

"(d) Use of the secret ballot has been denied in many cases.

"(2) The international unions surveyed by this committee have flagrantly abused their power to place local unions under trusteeship or supervisorship.

"(a) Some trusteeships have been baselessly imposed.

"(b) Some have lasted for as long as 30 years.

"(c) Rank-and-file efforts to throw off such shackles have been ignored, rejected, and sometimes met with violence and intimidation.

"(d) Locals under trusteeship have been plundered by the very officials entrusted with the management of their affairs.

"(e) Locals under trusteeship have been used as pawns in political battles within international unions, often in order to boost the ambitions of particular candidates for high office."

The McClellan Committee felt that special findings were necessary for the Teamsters Union, and they were in part as follows, Interim Report, supra, 443–450:

"1. Teamster officials have crushed democracy within the union's ranks. They have rigged elections, hoodwinked and abused their own membership, and lied to them about the conduct of their affairs. They have advanced the cause of union dictatorship and have perverted or ignored their own constitution and by-laws.

"Hoffa, with the help of Einar Mohn and Dave Beck, established through

"Tony Ducks" Corallo and John Dioguardi phony local in New York City in order to gain the necessary votes to assure the election of Mr. Hoffa's candidate, John O'Rourke, as president of joint council 16. Thereafter, votes were cast in the names of individuals listed as officers and delegates who claimed that they not only did not participate in the election but did not even know that they were members of a labor organization.

"At the recent international convention of the teamsters in Miami, Mr. Beck and Mr. Hoffa, with the help of their bevy of lawyers, made a mockery of the international constitution. They showed that they regarded the constitution as a piece of paper to be obeyed or ignored as it might benefit them. In this instance, the decision was to waive the constitution. Without this action, Mr. Hoffa could not have been elected teamster president.

"Delegates from a New York local who participated actively in the convention were not elected until 10 days after the convention was over. The ultimate cynicism of the Miami situation is demonstrated, however, by the colloquy which took place between the committee and a Hoffa supporter from Detroit. He was asked if he was a delegate to the convention and he replied that he was. He was asked when he was elected and he replied that there was to be a membership meeting that night to consider the nominations and election of delegates and he was to be elected at that time."

The other general conclusions are to the same effect and are printed in the margin.[40]

40. "2. They have acted to the detriment of their own members by entering into collusive agreements with management for the purpose of power, money and/or self-aggrandizement. They have promoted and condoned the signing of 'sweetheart' contracts.

\* \* \* \* \*

"3. Teamster officials have entered into highly improper business relations with the officials of companies with whom they bargained.

\* \* \* \* \*

"4. The teamster leaders have entered into highly improper business relationships with the insurance companies which han-

It seems important to observe that the lack of union democracy and the perversion of the union constitution stand at the head of most of these tragic findings. These investigations seem to have led the McClellan Committee to think that if union democracy could have been preserved, then a lot of the other abuses would never have followed. In the Legislative Recommendations it was said, *"Much that is elicited in the Committee's findings of misconduct by union officials can be substantially improved, in the committee's view, by a revitalization of the democratic processes of labor unions."* (Emphasis supplied.) Interim Report, supra, at 452. These conclusions are reinforced by the words of Senator Curtis, a member of the McClellan Committee, who said, 105 Con'g.Rec. 5862 (daily ed. April 23, 1959):

> " . . . During the many months in which I have sat on the select committee I have heard the tales of many offenses—embezzling, racketeering, boycotting, and a long list of other unlawful acts. However, that testimony has not shaken my faith in the honesty and integrity of the working force of America. The men and women who toil are individuals of character and responsibility.

"It is my firm belief that if the real power in a union is vested in the rank and file of its members, that accomplishment alone will eliminate a great portion of all the abuses and misuse of funds and misuse of power and the other offenses which all of us must frown on * * *."

The thesis that perversion of union democracy lies at the bottom of union corruption seems further buttressed by the words of one who has lived in day-to-day contact with the Teamsters' Union, which is allegedly one of America's most corrupt unions. Mr. Godfrey P. Schmidt was one of the three monitors appointed by the courts for the Teamsters Union. He was also a professor of constitutional law at Fordham University. Mr. Schmidt wrote a letter to Senator Kennedy urging that a bill of rights for the union member be included in the proposed labor reform bill. This letter was made a part of the McClellan hearings and was also read into the Congressional Record by a Senator. Mr. Schmidt wrote in part, 105 Cong.Rec. 5823 (daily ed. April 23, 1959):

> "One of the most rampant abuses of power in the labor movement consists in the practice of visiting reprisals upon union members and officials who dare to exercise free

dle the millions of dollars of health, welfare, and pension funds. They have approached banks which are the repositories of the accounts of union funds for special favors and loans at unusually low rates of interest.
  \*    \*    \*    \*    \*

"5. Teamster leaders encouraged and negotiated top-down contracts—agreements made between top management and top labor which resulted in forced entry of employees *into a union not of their choice.*
  \*    \*    \*    \*    \*

"6. Teamster officials took hundreds of thousands of dollars of union funds for their own personal use.
  \*    \*    \*    \*    \*

"7. Teamster officials have used millions of dollars of union funds without the authorization or knowledge of their members.
  \*    \*    \*    \*    \*

"8. They have condoned violence as the proper method for settling labor-management and inter-union disputes.
  \*    \*    \*    \*    \*

"9. Teamster officials have seriously abused the right of organizational picketing, using it as a weapon of extortion and terror. In all of these instances, the wishes, desires, and interests of the employees involved as to whether they wished to be unionized were never considered.
  \*    \*    \*    \*    \*

"10. They have supported corrupt unions in their disputes with honest unions.
  \*    \*    \*    \*    \*

"11. They have indiscriminately used the power of placing locals under trusteeship and kept these union entities in servitude when it served the interests of the union leadership to do so. When a local is under trusteeship, its members completely lose control over their finances and the right to elect their own officials."

speech in opposition to the wishes of the programs of powerful labor leaders. The Wagner Act long ago forbade reprisals by employers against workers who indulged in concerted activities. The measures of proof in such cases is a fair preponderance of the evidence. The labor boards have, with great solicitude, pursued employers who make use of reprisals against workers. The law should forbid the much more ruthless and extensive reprisals by labor leaders against the rank-and-file members and officers. The boards should use the same meticulous solicitude to prevent this type tyranny (which is breeding a dangerous servility in rank-and-file members) as it has used to punish employer tyranny. It is no answer to say (as I think Professor Cox said) that we have criminal laws in our books to prevent and to punish threats and coercion. Such laws are usually inefficacious for the purpose I have in mind; because their measure of proof is proof beyond a reasonable doubt. Threats and coercion have become so commonplace and widespread in the union movement as to suggest Fascist oppression and a faceless way of life for the rank-and-file worker. *You asked me why the Teamster membership have not risen up to oust the criminals from their union and to purge it of corrupt practices. * * * * [Remarks by Senators omitted.]

"*Any rank and file member* (who will talk frankly and courageously and who has not been brainwashed by the ceaseless union-leader propaganda) *can give you the answer. He is afraid to protest. He is afraid to stand up and say what is on his mind in a union hall. If he does, he incurs the peril of personal violence, of threats, and of a whole series of pressures ranging from frankly brutal to hypocritically subtle.* He has been given no indication by Congress, the courts, and the law enforcement agencies that he has much of a chance to come off successfully if he enter the unequaled struggle against labor leaders. The latter have unlimited expense accounts, large union treasuries which they use as their own facilities, competent and often devious lawyers, paid out of union treasuries, a horde of actual or potential investigators and goon squads to take care of the more recalcitrant cases. The worker stands alone against and unprotected from the union boss who is often feared more than any company boss. He must depend upon free legal advice given sporadically, or he must pay his own legal bills. The point is that a new unfair labor practice of labor leaders should be defined for the purpose of guaranteeing workers free speech and a bill of rights and freedom from reprisals when their views collide with those of their leaders. Your bill would, I think, be unacceptable and inefficient precisely because it fails to take care of this most important abuse." (Emphasis supplied.)

The words of Senator Curtis and Godfrey Schmidt are reinforced by those of Senator Hubert Humphrey, who made a stirring speech extolling the good points of the American labor movement.[41] After elaborating on the virtues and achievements of the labor movement, Senator Humphrey turned to the question of

41. On the day that the Conference bill passed the Senate by a vote of 95-2, Senator Humphrey said in part, 105 Cong. Rec. 16431-432 (daily ed. Sept. 3, 1959), "It is true that there has been evidence of corruption, racketeering, and gangsterism, which would make anyone sick at his stomach, and which is unworthy of this country or its people, and surely unworthy of the traditions of the trade union movement of the Nation. To those who have so tainted the reputation of the labor movement, I say they have committed a dastardly disservice to the cause of working men and women, to those who work in the shops and factories and work hard to make a decent living. But those who have so betrayed their trust are but a

cleansing the union movement of the corruption that had been uncovered by the McClellan Committee. Senator Humphrey said, in part, 105 Cong.Rec. 16433 (daily ed. Sept. 3, 1959):

"I say to the union members, I know of no law that can protect you from mismanagement. There is only one way to protect democracy in government, in a union, or in any other institution. That means the people had better take care of their business.

"If only 10 percent of union members attend meetings—and that is a

small and discredited segment of labor. Let us keep that in mind.

"There are more than 16 million Americans in organized labor. They are in my hometown, and in the hometown of every other Senator. They work on railroads. They work in the mines. They work in the forests. They work in the shops. They work in the retail stores. They work in our steel factories. They drive our trucks. These same people are members of PTA's, churches, civic associations, veterans groups, and fraternal lodges. They are good citizens. They are the backbone of our country in peace and in war.

"To be sure, there are some in the labor movement who have abused their power. May I add there are some in industry as well who have abused their power. There are some in public life who have done likewise. It should not be assumed that the labor movement has an exclusive monopoly on original sin.

"There is no room for corruption in labor, government, business, or any other segment of American life. It is the duty of this lawmaking body to perfect the law so that it is just, fair, and sufficiently strong to be able to bring to the bar of justice those who are guilty of wrongdoing. I admonish my colleagues, however, to remember that a man is not guilty merely because someone says he is. In this Nation a man is considered innocent until proven guilty. Let that fact be remembered as Khrushchev comes to this country. In his country, a person is guilty until he can prove his innocence, if he happens to run counter to the prevailing power. In America the law is entirely opposite. We believe in the principles of Anglo-Saxon law which proclaim that a man is innocent until he is proven guilty in a court of justice before a jury of his

good average—we can expect abuse of power. . . .

"If union members really want unions which will be effective and will protect their interest, they had better get to the union meetings. . . ."

Returning to the facts of this case, it seems obvious to this Court that there is no point in these Petitioners or any other union members going to their union meetings if they are going to be met with letters such as the one in this case sent by the GEB on November 15, 1961. These Petitioners have already been

peers. Many times it takes a long while to prove guilt, but I would rather have the abuse of the length of time that it takes to prove guilt than one abuse of dictatorial power in leveling a charge of guilt against the innocent.

"Mr. President, the labor movement in this country has done great good for the Nation. I remind my colleagues that the labor movement was the first to speak up for public education. The labor movement was among the first to speak up for social legislation. The social security laws would never have been placed on the statute books by the Congress if it had not been for the labor movement. Workmen's compensation laws, the 8-hour day, health protection for men and women in industry and child labor laws are the product of the labor movement. And it has played a dramatic role in lifting the standard of living for millions and millions of Americans who have never even belonged to a union or paid a dime in dues.

"Free organized labor has been good for America, just as the independent banking system of America has been good for America and good for American enterprise; and I do not believe in condemning banking merely because a handful of bankers put their hands in the till to take money that is not theirs. I am not for a Government banking system owned and managed by the Government. I am not for a trade union system owned and managed by the Government. I do not believe in accusing a whole group or movement of guilt because of the crimes, mistakes, or sins of a few.

"I believe I speak for this body tonight when I express these thoughts. I do not believe there are many Members of this body who do not believe labor has been good for America."

through one kangaroo court in this union. That injustice was not corrected by the GEB. This letter of November 15, 1961, suggests to the Petitioners that the GEB is inalterably on the side of the Respondents. Without hearing the case of the Petitioners, the GEB has again assisted the cause of the Respondents. This letter not only deprived the Petitioners of reimbursement for their legal expenses for the first Federal trials; it suggested that if more kangaroo courts were forthcoming, there would be no help from the GEB. This would in turn cause the Petitioners, men of modest means, to have to again seek the aid of the Federal courts. This is the way that freedom of speech in the union hall is snuffed out; this is the way that tyranny begins. As the House committee report said, H.Rep.No.741, 86th Cong., 1st Sess. 6 (1959):

"The power and *control of the affairs of a trade union by leaders who abuse their power and forsake their responsibilities inevitably leads to the elimination of efficient, honest and democratic practices within such union,* and often results in irresponsible actions which are detrimental to the public interest." (Emphasis supplied.)

It is as important to keep corruption from getting started in a union as it is to dig it out after it is firmly embedded, and it is certainly a lot easier. It therefore seems proper to take alarm at the first indication that freedom of speech in the union hall is being impaired. Cf. Engel v. Vitale, 370 U.S. 421, 436, 82 S. Ct. 1261, 8 L.Ed.2d 601 (1962).

For these reasons as well as all of those previously mentioned, this Court feels that the demands of union democracy outweigh, in the circumstances presented here, the autonomy of otherwise independent unions. At least two other courts have expressly considered this same question in similar cases and also cast their votes for union democracy. Parks v. International Bhd. of Elec. Wrkrs., 203 F.Supp. 288, 310 (D.Md. 1962); Mitchell v. International Ass'n of Machinists, 196 Cal.App.2d 796, 16 Cal.Rptr. 813, 818–820 (1961), petition for hearing denied, No. 24913, Cal.Sup. Ct.(1962). As the court said in Crossen v. Duffy, 90 Ohio App. 252, 103 N.E.2d 769, 778 (1951):

"[W]e recognize that it is not generally the function of courts to control the policies or the internal affairs of labor unions, but the courts may and should protect the democratic processes within unions by which union policies and their leaders are determined."

The role of this Court is a limited one in this area. As one writer has said, Summers, The Political Liberties of Labor Union Members—A Comment, 33 Tex.L.Rev. 605, 615 (1955):

"[L]egal intervention should be limited to protecting the democratic processes within the union. The [courts] should keep clear the channels of discussion, criticism, and advocacy so that a minority is free, through the process of peaceful persuasion, to become a majority. [The courts] should not attempt to prescribe the policies which that democratic process should make."

In this vein, it might be pointed out that the instant case is not one in which this Court is looking to the future and telling independent unions what they may or may not do in situations which have not arisen. This is a case which is cabined by a record of definite events; it faces backward and not forward. This Court is certainly not saying that a union may not validly adopt a policy discouraging resort to the courts. Compare Cox, The Role of Law in Preserving Union Democracy, 72 Harv.L.Rev. 609, 615 (1959). Such policies, however, obviously will not fare well in the courts when internal remedies for patent wrongs have proven futile in the past.

## V. THE CHOICE OF RATIONALE

The second importance of the Cohen case lies in the sharp contrast between the two approaches taken by the Court there to arrive at the same

result. The question is which approach should have been taken here. The court there first utilized the theory of ultra vires and, as previously indicated, that theory could possibly be employed here to reach one result or another. Are the doctrines of contract and ultra vires the best available tools for fashioning relief in this area of the law?

There have certainly been a number of legal scholars who have pointed out that the use of conventional doctrines in a case involving the internal affairs of a union affords considerable opportunity for inarticulated manipulation to reach the desired result. The pioneer work in this field seems to have been produced by the late and distinguished Professor Zachariah Chafee of the Harvard Law School. Chafee, The Internal Affairs of Associations not for Profit, 43 Harv.L. Rev. 993 (1930). Some in this group have been content to point out that the courts have given more than adequate protection for the rights of the union member, and Professor Archibald Cox of the Harvard Law School is one of these. Cox, The Role of Law in Union Democracy, 72 Harv.L.Rev. 609 (1959). Others in this group have been rather critical of this manner of deciding cases, and Professor Clyde W. Summers is undoubtedly the most vociferous of these.[41a] But the court in the Cohen case is invulnerable to any such criticism for its second and alternative approach to the problem in that case unequivocally rejected conventional doctrines and boldly dealt with the problem in terms and concepts that subsequent travelers along the same path can clearly understand.

The alternative rationale in Cohen was much simpler. 182 F.Supp. at 620–621.

The court concluded that to allow the funds of union members to be used to defend officers accused of pilfering other such funds was inconsistent with the aims and purposes of the L.M.R.D.A., which was enacted to eliminate such improper practices on the part of union officials. In other words, the policy was ascertained, the facts were examined, and a decision was reached that the policy had been frustrated. This Court feels that the continuing controversy in this case compels its resolution by an equally forthright approach, and so it is the latter approach in Cohen which has been followed here. Although this latter approach was given less weight in Cohen, it has been argued to have been the more important of the two grounds for the result. Note, The Fiduciary Duty of Union Officers Under the L.M.R.D.A.: A Guide to the Interpretation of Section 501, 37 N.Y.U.L.Rev. 486, 497 (1962). More important, however, are considerations basic to the statute. The L.M.R. D.A. took a definite step into the regulation of union internal affairs. It expanded the national labor policy into the area of relations between the employees and the labor union. Previously national labor policy had been confined to the labor-management area. See Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich.L.Rev. 819, 852 (1960). Prior to 1959 there possibly would have been need for caution in the area of law involved in this case. Unlike the Cohen case, the basic problem here is protection from unlawful suspension or expulsion from the union. It has been suggested that the common law in this area is not completely clear.[42] It has been contended that some of the com-

41a. "[T]he courts have not sufficiently articulated the standards which they in fact enforce. The reasons for their decisions are curtained by language of contract and by avowals of non-intervention in the affairs of fraternal associations. This hinders their facing squarely the difficult problem of the appropriate scope of intervention. It also tends to mislead judges with limited insight who cannot see past the words to the underlying policies being enforced. Even more, it creates a sense of uncertainty in union members who must gauge their conduct according to advice given by lawyers who are often wholly deceived by the screen of judicial language." Summers, The Political Liberties of Labor Union Members, 33 Tex.L.Rev. 603, 609 (1955).

42. "The Courts, in deciding union discipline cases, have produced a bewildering tangle

mon law theories available to the wronged union member are without any theoretical basis.[43]  It has been said that the "contract" is a fiction.[44]  It has been implied that the "property right" is no more than another excuse for judicial intervention.[45]  It has been said that some courts have been crafty and some have been bold.[46]  It has been argued that such methods have produced uncertainty as to the rights of the union member.[47]  But there is no need to tarry and

of inconsistent rules and results. This mass of contradictions is more than a difference of opinion among various courts, for a court will frequently evade even its own rules and precedents.  At the source of the confusion lies an unresolved conflict in the minds of the judges themselves."  Summers, Legal Limitations on Union Discipline, 64 Harv.L.Rev. 1049, 1050 (1951).

43.  One scholar has said that three theories and five different grounds have been used to invalidate expulsions.  Cox, The Role of Law in Union Democracy, 72 Harv. L.Rev. 609, 615 (1959).  This article is quoted in part in Parks v. International Bhd. of Elec. Wrkrs., 203 F.Supp. 288, 305 (D.Md.1962).

44.  One writer has noted that a large number of courts have relied on the idea of the Union constitution as a contract but concluded, " *. * * it is not easy to fit the three tests discussed within the law of contract."  Stone, Wrongful Expulsion from Trade Unions: Judicial Intervention at Anglo-American Law, 34 Can.B. Rev. 1111, 1125 (1956).  Speaking of the contract theory, a distinguished commentator early said: "Who are the parties? * * * If possible, we should seek a simpler explanation of the rights of an association member.  * * * [T]he member's contract * * * is often a legal fiction which prevents the courts from considering attentively the genuine reasons for and against such relief."  Chafee, The Internal Affairs of Associations not for Profit, 43 Harv.L.Rev. 993, 1003– 1007 (1930).  "The contract of membership is even more of a legal fabrication than the property rights in membership. With whom does the member make his contract?  Most courts say that it is with the union—but the union may not be a legal entity.  A few courts have attempted to avoid this difficulty by saying that the contract is with the other members—a contract with a million others who have no knowledge and little concern.  What are the terms of the contract?  The constitutional provisions, particularly those governing discipline, are so notoriously vague that they fall far short of the certainty ordinarily required of a contract. * * * [Membership in a union] is a special relationship.  It is as far removed from the main channel of contract law as the relationships created by marriage, the purchase of a stock certificate, or the hiring of a servant."  Summers, Legal Limitations on Union Discipline, 64 Harv. L.Rev. 1051, 1055–56 (1951).  "In large measure and particularly in the critical cases, the contract is what the judges say it is."  Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L.J. 175, 180 (1960).

45.  "Judicial opinions are salted with statements that the courts will not interfere in the internal affairs of unions unless property rights are involved.  However, the courts have been extremely ingenious in finding some interest which they could label a 'property right' in order to justify giving relief against disciplinary action. * * * The willingness of the judges to search out and denominate some particular interest in membership as a 'property right' reflects a strong desire to grant legal protection to a more valuable general interest.  In the magic of the word 'property' they find justification for ignoring their traditional policy of nonintervention.  Many courts do not even attempt to isolate the property right involved, but refer to membership itself as a property right.  It is significant to note that regardless of the particular property right discovered, the courts do not limit their relief to protecting that right, but order complete reinstatement in the union.  They thereby reveal that membership is the interest to be protected and the finding of a property right is not a reason but an excuse for the decision."  Summers, Legal Limitations on Union Discipline, 64 Harv.L.Rev. 1049, 1051–54 (1951).

46.  Summers, Union Powers and Workers' Rights, 49 Mich.L.Rev. 805, 827 (1951).

47.  "Although the legal theories do not bar, but in fact provide the basis for legal relief, the union member finds no such assurances.  The systematic deception in judicial opinions destroys any confidence that when the court's help is needed it will be forthcoming.
"The fact that the courts do give legal protection is beclouded by the reasons given.  Seldom have courts been so forthright as the Ohio court in Crossen v. Duffy in declaring that a union member is

quibble over legal history, for Congress in 1959 left no doubt as to the rights of the individual union member. *If* the law relating to expulsion and suspension was not clear before, it is clear now. *If* there was a necessity to resort to fictional doctrines prior to that time, the need has vanished now.[48] *If* there have been some labor union officials who have thought that they could flaunt the rights of the union member with immunity from the courts, they should be thoroughly disabused of the notion. If a policy can be construed from the L.M.R.D.A. and the facts warrant its application, it therefore seems preferable to take this latter approach for the reason that it is the one more likely to achieve the previous purpose. As one writer has argued, "This protection by subterfuge and the unwillingness to protect openly the right of free participation leave dangerous pitfalls in the law." Summers, Union Powers and Workers Rights, 49 Mich.L.Rev. 805, 828 (1951). This Court sees no reason to leave the slightest doubt in the mind of the autocratic union official that the will of the Congress is going to be strictly enforced. The second approach in the Cohen case thus seems preferable,

and, as previously stated, it is this approach which has been followed here.

## VI. PARKS v. INTERNATIONAL BHD. OF ELEC. WRKRS.

The previously cited case of Parks v. International Bhd. of Elec. Wrkrs., 203 F.Supp. 288 (1962) is another important case. There is little similarity between the facts of that case and those of the Cohen case, but there is some parallel as to the manner in which Parks and Cohen were decided. The Parks case was an action to enjoin the International Union from revoking the charter of the Local and for other relief. All the interrelated facts in that controversy are spread throughout four opinions [49] and so only those deemed by this Court to be of interest here will be mentioned. It seems that the central fact in that case might well have been that the General President of the IBEW had not acted in accordance with the fiduciary standards imposed upon his position of trust. Local 28 certainly might have thought so, if the claims at 203 F.Supp. 290 afford any indication of what that Local was thinking.[50] In addition, Section 501 of the L.M.R.D.A. was specifically adverted to

entitled to the rights of a citizen within his union. Seldom have they declared restrictive offense provisions void as against public policy. Rather they have resorted to strained interpretations and distortions of facts, or have seized upon minute defects in the procedure to find a pretext for ordering reinstatement. Too often have the courts, by a hollow repetition of the substantial evidence rule, given a verbal vote of confidence to union tribunals with built-in bias.

"Because protection is by subterfuge, much of its value is lost. Lawyers who, in advising union members of their rights, must rely upon limited research are misled by the mask of judicial language and fail to see that it conceals an unspoken policy of protecting political rights. Judges with limited insight and little courage blindly follow the specious rules of thumb to unbearable results, and thus deny in one case out of five the right to political freedom within the union. In spite of the broad legal protection actually given by the courts in the other four-fifths of the cases, union members have small sense of assurance that they dare campaign or criti-

cize with vigor. Even though they are prepared to face the interminable delays and meet the burdensome costs, they are given no promise that eventually their fundamental rights will be vindicated. As a result the fear of discipline remains and union democracy is denied full realization." Summers, Union Democracy and Union Discipline, N.Y.U. 5th Annual Conf. on Labor 443, 480 (1952).

48. To borrow some words from a slightly different conclusion, " * * * [N]o longer need one grope around in the fanciful world of contract law, as applied to cases of wrongful expulsion, to locate a firm legal foundation upon which to rest judicial relief." Stone, supra at 1138.

49. The three previous opinions are Local Union No. 28 v. International Bhd. of Elec. Wrkrs., 197 F.Supp. 99 (D.Md. 1961) ; Local Union No. 28 v. Maryland Chapter, 194 F.Supp. 494 (D.Md.1961) ; Local Union No. 28 v. International Bhd. of Elec. Wrkrs., 184 F.Supp. 649 (D.Md. 1960).

50. "Plaintiffs claim that the action of the International President (IP), later affirm-

by the court at 203 F.Supp. at 295–296 where Judge Thomsen said:

"The fiduciary responsibilities of officers' dealt with in Title V of the Act, sec. 501 et seq., 29 U.S.C.A. § 501 et seq., are primarily if not entirely, pecuniary. But the broad declaration in the first sentence of sec. 501(a)—'The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group.'—emphasizes the nature of the officers' duty, which is not limited to pecuniary matters."

Judge Thomsen also concluded a side remark by saying, "But the officers of IBEW must not forget their duty to the individual locals and members." 203 F. Supp. 300 at fn. 22. Finally, his key decision at 203 F.Supp. 309 was that the duty owed by the IP and the IEC had been breached. But the initial problem in that case was whether the court had jurisdiction. Local 28 was relying in this regard *only* upon Section 301(a) of Taft-Hartley, 29 U.S.C.A. § 185(a). This key fact appears in footnote 2 at 203 F.Supp. at 291 and also in footnote 1 at 197 F.Supp. at 101. The court solved the problem with some interesting reasoning appearing at 203 F.Supp. at 291–292 and also at 197 F.Supp. at 105–106. Included in the rationale was a determination that the union constitution was a contract between Local 28 and the IBEW. This Court has read an unusual number of legal commentaries in dealing with its own problems and can attest, if the scholars are to be believed, that there are probably hundreds of state court decisions in which the contract theory has been employed to invalidate improper expulsion of individual union members from their unions. One of these articles is cited and quoted at 203 F.Supp. 305. Of course, one reason for the writing of some of these commentaries, particularly in the case of Professor Summers, was to protest vehemently that the "contract" was a total fiction designed to hide the court's real reasons for intervention. But it is the well-known function of law teachers to offer their thoughts to the profession, and so there is nothing unusual about a little criticism. In addition, it must be recalled that Judge Thomsen had words of guidance from the Supreme Court concerning Section 301(a) of Taft-Hartley:

"The range of judicial inventiveness will be determined by the nature of the problem. * * * [S]tate law, if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy." Lincoln Mills, supra, 353 U.S. at 457, 77 S.Ct. at 918, 1 L.Ed.2d 972.

After the court had decided that there were two "unions" and a "contract" in the case—which afforded jurisdiction under Section 301(a) of Taft-Hartley—it ultimately reached the merits. 203 F. Supp. at 296–305. This Court is not

---

ed by the International Executive Council (IEC), revoking the charter of Local 28, and granting its jurisdiction to Local 24, a new local chartered immediately after the revocation, was illegal and invalid: (I) because the stated ground, that Local 28 had violated the constitution of the IBEW by engaging in a strike without the approval of the IP, was not a sufficient ground, since the strike was not the kind of strike which required the approval of the IP; (II) because, even if Local 28 had violated the constitution, (a) its charter should not have been revoked without a fair hearing before a tribunal authorized to decide the case, which was not accorded; (b) the action of the IP was a breach of the duty owed by the IP to Local 28 and its members, was illegal and against public policy, and was taken in bad faith, in that the purported ground was only a pretense for punishing the members of Local 28 for defying his wishes in connection with the collective bargaining agreement the Local was negotiating with the Maryland Chapter of the National Electrical Contractors' Association (NECA), and for having brought several suits in court against the IBEW without exhausting intra-union remedies; and (c) the action of the IP was an unreasonably severe and unjust sanction under all the circumstances." 203 F.Supp. at 290.

going to do injustice to Judge Thomsen's able recitation of those facts by attempting to summarize them in any detail. It is enough to say that there had long been a bitter dispute in Local 28 over wage negotiations, an allegedly unauthorized strike was called, and the International President expelled Local 28 from the IBEW. This was done to punish certain members of Local 28 which the IP did not like. 203 F.Supp. at 304. This in turn was followed by the establishment of a rival union to ultimately drive Local 28 out of existence. 203 F.Supp. at 305. In Judge Thomsen's first opinion, 197 F. Supp. 99, he refused to intervene in the controversy until the Local had appealed to the International Executive Council, which ultimately proved fruitless. In the second opinion it was argued that an appeal to the International Convention was required by the union constitution before the Local could resort to the courts. Judge Thomsen gave this argument little weight, noting that the Convention would not convene until more than a year after the decision of the International Executive Council. 203 F. Supp. at 294–295.

Judge Thomsen's discussion of the legal significance of the facts is also quite

long. 203 F.Supp. at 305–312. He was first met with the argument that the Union Constitution permitted the revocation of Local 28's charter because the Local had engaged in a strike without the consent of the IP. The plaintiffs conceded that the strike may have been one requiring the approval of the IP but argued that the revocation was illegal and invalid because, 203 F.Supp. at 307:

> "[I]t (a) was rendered without a fair hearing before a properly constituted tribunal, (b) was a breach of the duty owed by the IP to Local 28 and its members, was entered in bad faith for improper reasons, and so was illegal and against public policy, and (c) was an unreasonably severe sanction."

Judge Thomsen then discussed these points one by one.

He was first concerned about the lack of a fair hearing prior to the expulsion of Local 28 by the IP. He had previously described the expulsion in more detail [51] and had also found that the International President was prejudiced toward a faction in Local 28,[52] and he felt that "the fatal defect in the procedure" was

51. "On July 7 the International served on Local 28 charges, prepared by the IBEW counsel and signed by the IP, requiring the Local to show cause why its charter should not be revoked for engaging in a strike without the consent of the IP, as required by Art. XVII, sec. 13, of the constitution. An independent referee was appointed under Art. IV, sec. 11, of the constitution, to take testimony, make findings of fact and report to the IP, but the IP reserved to himself the decision of all questions of constitutional interpretation, and scheduled an argument before himself on all issues of law and fact, to be held after the referee submitted his report. Local 28 requested an opportunity to examine the IP and certain other officers and International representatives, but the IP refused to appear, because as he later testified: ' * * * in the final analysis I would have to make a decision on the case'.
   "On July 12 the Local suggested to the IP that the terms of the new contract be referred to an independent arbitrator,

but the IP refused and said that the only way Local 28 could avoid disciplinary proceedings would be to return its members to work and submit all unresolved issues to the Council." 203 F.Supp. at 303.

52. "Freeman [the International President] was very angry when he read the letter from Local 28 and heard the proposal of the Maryland Chapter." 203 F.Supp. at 301. " * * * I find that the IP was also and primarily moved by a desire to acquire and retain as much control as he could over the negotiations with the Maryland Chapter because he distrusted Eveson, Beckhardt and O'Doherty and other leaders of the group that controlled Local 28, as the result of the previous difficulties, in which, however, the fault did not all lie on one side. He was also angry with the leaders of Local 28 because they had sued IBEW without exhausting their intra-union remedies. He stated publicly that he 'hated' the Landrum-Griffin Act because it protected access

not cured by an appeal to the IEC. 203 F.Supp. at 308.

Judge Thomsen said in part, 203 F.Supp. at 307:

"It is a settled principle that a member of a union is entitled to a full and fair hearing before he is expelled, whether or not the union constitution specifically so provides. * * * One of the basic requisites of a fair hearing is an unbiased and disinterested tribunal."

Local 28 had originally argued that this lack of a fair hearing violated Title I of the L.M.R.D.A., but this position was abandoned because of the feeling that those provisions applied only to individuals and not local unions. 197 F.Supp. 101 at fn. 1. In deciding that the lack of a fair hearing was a "fatal defect," Judge Thomsen seemed to rely on the State court decisions as Lincoln Mills gave him the right to do. He may also have been relying on the spirit, though not the letter, of Title I of the L.M.R.D.A., which Lincoln Mills also gave him the right to do. In any event, the right to a fair hearing before the loss of valuable rights is a well settled principle in our jurisprudence, as Professor Cox pointed out in the quote at 203 F.Supp. 305.

Judge Thomsen next took up the duty of the IP, to which he had previously adverted several times. He had previously noted that the broad declaration concerning "positions of trust" in the first sentence of Section 501 of the L.M.R.D.A. "emphasizes the nature of the officers' duty, which is not limited to pecuniary matters." 203 F.Supp. at 295–296. He decided that this duty bound the IP to act at all times "in good faith and not maliciously or in violation of the duty he owed to the members of Local 28, as well as to all other members of the

IBEW." 203 F.Supp. at 309. It is important to note that although Judge Thomsen went on to discuss the public policy factors in the case, he said, 203 F.Supp. 309–310:

"I adhere to the views expressed in 194 F.Supp. at 500, 501, *but prefer to rest this decision, as I did that one, on other grounds.*" (Emphasis added.)

What grounds was he referring to? The answer is plain. He considered that the duty imposed in part by Section 501 of the L.M.R.D.A. upon the IP and the IEC had been breached, considering all the circumstances of the case. At 203 F.Supp. 309, he said:

"The important conclusion is that *the revocation of the charter of Local 28 by the IP under the circumstances of this case was a breach of the duty he and the International owed to Local 28 and its members* under the union constitution, and amounted to a breach of the contract represented by that constitution." (Emphasis added.)

The talk of contract seems no more than token homage to the jurisdictional basis upon which the case rested.

The discussion of the "public policy" in the case seems to make it very clear that the fiduciary duty imposed on the IP was foremost in the mind of Judge Thomsen. 203 F.Supp. at 309–310. Judge Thomsen first said:

"The questions of public policy in these cases are difficult. We have here a sharp conflict between two desirable principles—stability and labor peace on the one hand, and democratic control of local unions by their members on the other. See the thoughtful discussion of the problem by Professor Cox in the article re-

---

to the courts by union members." 203 F. Supp. at 302.

" * * * [H]e wanted to rid himself and the IBEW of the existing leadership of Local 28 and to discipline the members of the Local for their refusal to submit their disputes to the Council. * * * The revocation was intended to be and was

a form of discipline of the members of Local 28 for their refusal to agree to submit their disputes to the Council, as desired by the IP, and for having brought suits against the IBEW without exhausting their intra-union remedies." 203 F. Supp. at 304.

ferred to above, 58 Mich.L.R. 819, particularly pages 829–831, which I adopt rather than the over-simplification of the problem in favor of stability urged by the defendant."

Where did this "public policy" come from? Did Judge Thomsen feel that he was free to impose his own notions of "public policy" upon Local 28 and the IP of the IBEW? Does Lincoln Mills go that far? The answer is plain. Judge Thomsen was not operating under a smokescreen of legal mysticism; he spelled out the answers to all the questions, 203 F.Supp. at 310:

"The provisions which shall be included in the constitution and the policies which shall be followed by the officers are matters for the union as a whole to decide, subject to the restraints imposed by law. Federal courts may impose such restraints only within the jurisdictional limits provided by Congressional enactments, and must follow the policies established by the statutes, as interpreted by authoritative decisions."

What "statutes" was he referring to in this statement? Was he thinking of the Taft-Hartley Act? The next sentence contains the answer.

"The LMRDA is a step in the direction of democratic control, along a carefully defined path. It does not authorize a court to permit the members of a local union to flout the constitution and policies of the International and still claim the rights and privileges of membership therein. On the other hand, *an officer of the International may not disregard his common law and statutory duty to the members of erring union, nor ignore their rights.* He should be a good shepherd, and must not chastise his flock with unreasonable severity or for improper reasons." (Emphasis supplied.)

It is only too obvious that Judge Thomsen was addressing himself to the duty imposed by section 501 of the L.M.R.D.A. or the counterpart duty imposed by the state court decisions. Judge Thomsen cited many state decisions in his well-reasoned opinion, but he cited none in support of the previously quoted propositions.

The severity of the action that the IP had taken was indicated in the opening remark of the next portion of the opinion, "The revocation of a local's charter is an extremely drastic sanction, affecting all its members." 203 F.Supp. at 310. After spelling out exactly what revocation of the charter meant to the individual member,[53] Judge Thomsen noted that although some of the officers of Local 28 might have "unclean hands" which would bar relief if only they were affected, the case involved "the rights of many hundreds of innocent members, who were caught in the struggle between the IP and the present officers and leaders of Local 28." 203 F.Supp. at 311. He noted that some of these innocent members had joined the new Local 24 set up by the

---

53. " * * * It is particularly important to a local union of IBEW to be a part of the Building and Construction Trades Department of the AFL-CIO. The revocation of its charter removed Local 28 from the AFL-CIO and the Baltimore Building and Construction Trades Council, so that Local 28's picket line was not honored by many unionized construction workers, and made it difficult for Local 28 to place its members in jobs outside the Local's jurisdiction. It would be very difficult if not impossible for Local 28 to attract or hold members as an independent union, because the usual hiring hall arrangement gives priority to those who have passed an IBEW examination, and because any member who stayed with Local 28 as an independent union would forfeit his rights in the IBEW pension plan and the IBEW death benefit plan. "If a member withdraws from Local 28 in order to preserve his IBEW membership, he forfeits his claims to the pension, sickness, hospitalization, disability and other benefits provided by the Local. If Local 28 is forced to dissolve, all of its members, including those now drawing retirement pension benefits, would be deprived of those continuing benefits and would be compelled to accept in lieu thereof approximately $400, representing the proportionate share of each member in the Local's funds."

IBEW, some had obtained employment out of the area, and some in the area, but he also noted that "many have not found employment." 203 F.Supp. at 312. The severity of the sanction taken by the IP seems to have been the most important factor in the case, for Judge Thomsen concluded his discussion of the merits with the following, 203 F.Supp. at 312:

"All factors considered, I conclude that apart from the questions of fair hearing and good faith, the punishment of Local 28 and its members by the revocation of its charter was unreasonably severe and so unjust as to call for relief from this Court."

Judge Thomsen was, of course, cabined by the jurisdictional allegations and so the technical conclusion was reached when he said, 203 F.Supp. at 309:

"The important conclusion is that the revocation of the charter of Local 28 by the IP under the circumstances of this case was a breach of the duty he and the International owed to Local 28 and its members under the union constitution, and amounted to a breach of the contract represented by that constitution."

Although the use by the State courts of the contract theory in union discipline cases has been soundly berated by some of the previously cited commentators, the decision in the Parks case recalls the words of one scholar who said, Summers, The Political Liberties of Labor Union Members—A Comment, 33 Tex.L.Rev. 603, 605 (1955):

"The contract theory, however, is not a wooden rule which compels the courts to ratify injustice. Instead it provides a pliable logic which can be moulded by the courts to provide a wide measure of protection against discipline which destroys democratic rights. Few courts have been enslaved by the theory; most have found it a willing handmaiden."

There may be some commentators who will query whether the Parks case will ever be found in a contracts casebook for law students to ponder, but there is no doubt that the Parks case has a message of vital significance to the dictatorial union official and that he will not smirk at its grim import.

That case says that substantial rights can not be affected without adequate procedural safeguards. In that case that principle meant that the revocation of the charter had to be set aside because there was no fair hearing. In this case it would mean that the conclusions of the General President arising out of the so-called "investigation" (letter of September 29, 1961) would have to be set aside because the Petitioners were never contacted. The IP in the Parks case at least made a token gesture in the direction of fair play; the "investigation" in this case was a total sham. This Court has not decided this case on this rationale, but this point and many others are in ready reserve, eager to get into the fray.

That case says that unconscionable conduct will not be tolerated of union officials at any level Positions of trust are not to be taken lightly. In other words, equally settled standards of fair play and substantive union due process are binding upon union officials by virtue of Section 501 of the L.M.R.D.A. In that case that principle meant that the IP could not revoke Local 28's charter in bad faith nor could he take unreasonable sanctions against those to whom he owed a fiduciary duty, even though some of the members of Local 28 were not possessed of totally "clean hands" themselves. In this case that principle would mean that a national governing body of a union cannot discourage resort to the courts when internal redress has proven futile in the past. The reason in both cases is that such conduct flies in the face of settled notions of reasonable conduct, which at the least are implicit in Section 501 of the L.M.R.D.A. It is perhaps true that the principal guidelines for the duty of the union official will be found in the policies of the L.M.R.D.A. and the state court decisions. But it is certainly true that assistance in determining this duty

will also be derived from the sources which have been the fount of state and federal due process, e. g., notions of decency, justice and fair play developed by our English-speaking culture and interpreted and defined by the judges. Judge Thomsen as much as said that violation of these concepts was the main reason for his decision in Parks. See 203 F.Supp. at 312.

That case says that there are limits to the sanctions which those in positions of trust can employ against those whom they do not like. This, of course, is but a corollary of the foregoing propositions. The democratic process must determine the outcome of the union dispute—not the iron hand, the kangaroo court or the veiled threat. In that case that principle meant that the IP could not revoke the charter of Local 28 to vent his dislike of a certain faction. In this case it would mean that the Respondents can not solicit aid from above solely to harass the Petitioners. It is clear that the higher levels of unions exist for the aid and comfort of the lower, but cries by local officers for assistance from national officers must be made in good faith to solve bona fide problems and not to solicit aid to harass or eliminate dissident minority groups.

That case says that broad constitutional powers will not be allowed to outweigh the public interest in protecting valuable rights. Judge Thomsen spelled it out when he was speaking of the reasonableness of the sanction which had been imposed upon Local 28. 203 F.Supp. at 310–311. Weighing the various factors in the case, he said, 203 F.Supp. at 311:

> "Nevertheless, where a particular sanction is clearly permitted by the constitution of a union, the courts should be slow in substituting their judgment for that of the responsible union officials in determining whether or not it is too severe. Where, however, the imposition of a particular sanction is clearly unreasonable *under all the circumstances* and unjust to individual members of the

offending union, the courts should not hesitate to exercise whatever jurisdiction they may have to correct the injustice." (Emphasis supplied.)

In that case this principle meant that the constitutional provision which gave the IP power to veto all strikes and "at any time to enter any situation or controversy involving a L.U. or any of its members" (203 F.Supp. at 306) did not give the IP power to breach his fiduciary duty in the manner that he did. In this case it would mean that the GEB's authority under sections 60, 63 and 71 [54] of the Painters' Constitution (or any stronger provisions which might be drafted) will never be allowed to justify the impairment of freedom of speech in the union hall.

■ That case says that federal judges, like their state brethren, do not like to intervene in the internal affairs of unions, but they will do so if the alternatives are even less palatable. As one scholar has prophetically observed, "The felt need to protect against arbitrary action inevitably overrides the courts' reluctance to intervene." Summers, Judicial Settlement of Union Disputes, 7 Buffalo L.Rev. 405, 409 (1958). Judges would prefer that internal problems be solved by appeal to higher levels. Judges would prefer to completely leave all aspects of union management to the officials who have been elected to do the job. But if these officials deviate from their constitutional duties and take actions which impair rights conferred by Congress, federal judges can be expected to duly intervene. In that case this concept meant that Judge Thomsen did not jump into the dispute when he was first asked to do so. 197 F.Supp. 99. He was content to wait until the arbitrary action taken by the IP had been appealed to the IEC. When that body did not correct the injustice, Judge Thomsen stepped firmly and resolutely into the dispute and emerged with a decree agreed to by both parties. 203 F.Supp. at 313–316. In this

---

54. Quoted at footnotes 9 and 10 supra.

case the General Executive Board of the Painters' Union had its chance long ago to correct the injustice of the first union trials. The GEB did not rectify the misconduct and so Judge Devitt of this District did it for them. The instant phase of this case presents a worse abuse than negligence in the union appellate function. The GEB has intervened in this continuing factional dispute in a manner which simply will not be tolerated. This Court sincerely hopes that the GEB will continue to take an active interest in the affairs of all its locals, but "investigations" must be fairly conducted and "conclusions" must be impartially reached. As the Parks case held, and as this Court stands ready to hold, adherence to settled notions of procedural and substantive union due process is a vital part of the duty imposed by Section 501 of the L.M.R.D.A.

That case says that attacks on the jurisdiction of Federal courts will not be well received when Federal judges suspect that the will of Congress has been flaunted and patent injustice has been done. See also Hughes v. Local No. 11 of International Ass'n of Bridge, Structural and Ornamental Iron Workers, 287 F.2d 810 (3rd Cir., 1961). No technical arguments will be persuasive; no small barriers will hold back judicial redress. As Judge Thomsen said, 203 F.Supp. 311:

> "Where * * * the imposition of a particular sanction is clearly unreasonable under all the circumstances and unjust to individual members of the offending union, the courts should not hesitate to exercise whatever jurisdiction they may have to correct the injustice."

Those words can not be held too high or repeated too often. These words and all the others should leave doubt in the mind of none that Judge Thomsen has paved the way for a strict enforcement of the will of Congress as manifested in the L.M.R.D.A. If such scholars as Professors Archibald Cox and Clyde W. Summers are to be believed, Judge Thomsen has acted no differently than the state courts have always acted when confronted with patent injustice. "Inarticulate the courts have been, insensitive they have not." Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L.J. 175, 193 (1960).

What was said in Parks is important, but what was done can not be overlooked. Obedient to the mandate of Lincoln Mills, Judge Thomsen examined the policy and fashioned the remedy. What he did, to use a clumsy figure of speech, was to stand on the jurisdictional platform of Section 301(a) of Taft-Hartley and reach out at conduct which was contrary to public policy found in the state court decisions and the federal labor laws. In this case, to use the same terminology, this Court has stood upon the jurisdictional platform of Section 501 of the L.M.R.D.A. and, inter alia, attacked conduct which threatened to undermine Title I of the L.M.R.D.A. Putting aside the jurisdictional aspects of the case, Parks is quite similar to Cohen in that it is simply another case in which the public policy was ascertained, the facts examined, and a decision reached that the policy had been thwarted. That is not what was said but that is what was done, and as one writer has continually pointed out, "We can be badly misled if we listen too long to what the courts say and fail to watch closely what they in fact do." Summers, Union Democracy and Union Discipline, N.Y.U. 5th Annual Conf. on Labor 443, 477 (1952).

The decision of Local 28 to plead the Parks case in the way that it did may be the subject of some scholarly second-guessing. This Court is led to offer its otherwise improper comment that Local 28 may well have thought section 501 of the L.M.R.D.A. applied only to financial irresponsibility, for this Court thought the same thing at one time in the present litigation. Indeed, it was only after an exhaustive study of the legislative history (reported infra) that this Court was thoroughly convinced of the width and breadth of section 501 of the L.M.R.D.A.

## VII. YOUNG v. HAYES

The case of Young v. Hayes, 195 F. Supp. 911, (D.D.C.1961), is also relevant here. In that case the Executive Council submitted to the quadrennial convention of the International Association of Machinists proposed amendments to the union constitution. The IEC represented to the convention that the amendments were necessary under the L.M.R.D.A., and these amendments were subsequently adopted by the convention. The matter then had to be referred to all of the local lodges for their approval, which was obtained. The plaintiffs alleged that the forty-seven amendments should have been submitted separately to the Locals as was represented at the convention. The defendants claimed that these representations had not been made  The plaintiffs alleged a breach of the "contract" in the union constitution, a violation of Title I, Section 101(a) (1) of the L.M.R.D.A., and a violation of other provisions of the L.M.R.D.A. The plaintiffs alleged that six of the amendments were not necessary under the L.M.R.D.A. and would severely restrict the powers of the Local Lodges and rank and file and increase the powers of the International Organization.[55] The plaintiffs sought to enjoin the defendants from publicizing the results of the vote and from putting the amendments into effect.

The plaintiffs first argued that the combination of a great number of amendments into one proposition for the consideration of the Local Lodges was an abuse of discretion on behalf of the IEC. The Court agreed. 195 F.Supp. at 915. The extended discussion by the Court is couched in terms of breach of contract and violation of Title I of the L.M.R.D.A., but it seems clear that this is simply another case dealing in part with the restraints placed on those in positions of trust by the L.M.R.D.A. The Court there first said that the submission of the amendments in that fashion was an abuse of power because, inter alia, the spirit, if not the letter of the L.M.R.D.A., required their submission in a different form.[56] The Court further noted that the use of confusing terminology was

55. "(1) Article I. Sec. 3, as amended would give International President a veto over amendments enacted by a Local Lodge as to their By-Laws.

"(2) Article V. Sec. 3, would substantially broaden the powers of the defendant officials to invest funds belonging to the defendant International Organization.

"(3) Article VI. Sec. 5, expands the power of the International President to suspend persons within the Organization.

"(4) Article XXIV. Sec. 4, would give to the Executive Council the power to change at will any provision of the Constitution whenever it believes such provisions are in conflict with applicable civil law. In this way the Executive Council could completely circumvent the procedure set forth in Article XXIII and Article XXIV, under which members are guaranteed the right to approve or disapprove of all proposed Constitutional amendments.

"(5) Article XI. Sec. 2, would limit the use to which money raised by the Grand Lodge assessment could be used.

"(6) Article XVI. Sec. 7, would give to the International President the power to strike down requirements established by the District Lodges concerning the eligibility of candidates at the District Lodge level." 195 F.Supp. at 914.

56. "The Landrum-Griffin Act is a comprehensive item of legislation, and an attempt by the International Organization to submit to the membership a ballot wherein one proposition embracing, as it does, 47 amendments which the Court determines are in conformance with the Act rather than 'mandatory' in the sense they are required by the Act, is an erroneous construction of an ambiguous provision of the Union's constitution, and as such an abuse of power conferred on the defendants, or as provided for amending procedures by the Constitution. Harris v. National Union of Marine Cooks and Stewards, 1950, 98 Cal.App.2d 733, 221 P.2d 136, [26 LRRM 2493 (1950)]. See Articles V, Sec. 1 and 2, VI, Sec. 1, VII, Sec. 1, XXIII, XXIV, Sec. 3, and XXV, Sec. 1, of the constitution. The spirit, if not the exact wording of the Landrum-Griffin Act, contained in the so-called Bill of Rights of Members of Labor Organizations, section 101(a) (1), would seem to require the submission of the amendments believed to be needed in order for the Union to conform to the provisions of the Act, on a separate amendment basis, or at least a submission of the proposed amendments on the basis of subchapter headings as they appear in the United States Code Annotated, 29 USC

an additional reason for holding that the action of the officers was illegal. 195 F. Supp. at 916. The Court then observed that the fact that prior amendments had been submitted in this carefree fashion did not leave the procedure free from challenge " * * * if, in fact, it is violative of the constitution." 195 F.Supp. at 916.

The argument then centered around whether the L.M.R.D.A. gave affirmative federal protection to the plaintiffs in their right to vote as prescribed by their union constitution. The defendants said the legislative history required this question to be answered in the negative. In other words, the defendants, persons occupying high positions of trust and power, were saying that the L.M.R.D.A. did not compel them to honor the rights conferred upon the union members by their own union constitution. The defendants were also arguing that the L.M.R.D.A. had not put the Federal courts "into the business of enforcing rights granted by internal union law." 195 F.Supp. at 916. The defendants were saying that " * * * the Court should not enter into quarrels between union members and their unions, and the Court should place great weight on the interpretation given the constitution by the officers of the International Organization." 195 F.Supp. at 918. But the Court there took its guidance from the L.M.R.D.A. and not from those worn-out cliches. The Court said, 195 F.Supp. at 916:

"However, it would appear to this Court that a plain reading of the Act in its Bill of Rights portion, as well as others, is a clear indication by Congress that the right to vote extended in the Act is not a mere naked right to cast a ballot. Rather, *the general tenor of the Act would seem to indicate that those who make up the management of the union may not submit amendments for referendum to the membership in any form they wish.* Permitting a union to submit propositions to its membership in any form they wish might very well open up the way of usurpation of power by union management, which the Court cannot believe was intended by the framers of the Landrum-Griffin Act." (Emphasis supplied.)

In other words, the restraints placed on those in positions of trust are determined in part by looking at the policies of the L.M.R.D.A. The case is thus very similar to Parks. Both courts took jurisdiction under Section 301 of Taft-Hartley; both courts found a breach of contract. In both cases a violation of Title I of the L.M.R.D.A. was alleged; in Parks this allegation was withdrawn. But the important thing is that both decisions found that those in positions of trust had not acted in accordance with the obligations placed upon their offices. In Parks the restraints were found in the policies of the L.M.R.D.A., the state court decisions and in concepts of reasonable conduct. In Young v. Hayes the restraints were found in "the general tenor of the Act," its purpose of preventing usurpation of power, and the spirit of Title I. It was the Court's decision that the International Organization had to submit the proposed amendments to the membership in a more fair manner, even though the Court would "not take it upon itself to direct the International Organization to submit the amendments to the constitution in any specified way, other than to state that the amendments must be compiled in a ballot form suitable for submission to the membership through referendum consistent with this opinion." 195 F.Supp. at 917.[57]

*Ch. II, or some other grouping less comprehensive than trying to encompass the entire legislation in one Proposition."* (Emphasis supplied) 195 F.Supp. at 915.

57. "The contract theory may itself obligate courts to repudiate or rewrite constitutional provisions, for established contract doctrine requires that provisions contrary to public policy be nullified." Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L.J. 175, 180 (1960).

The case also resembles Parks in that in both cases the union officials were required to conduct themselves in accordance with certain procedural standards when dealing with the rights of those beneath them. The only difference is that the Parks case purported to derive this procedural due process from the state decisions and the Court in Young v. Hayes expressly derived the same sort of policy from the spirit of Title I of the L.M.R.D.A. The case further shows that those in positions of trust will not be allowed to use vague constitutional amendment provisions to tighten their control over local unions and possibly cut off the right of criticism of union policies. Young v. Hayes also seems to be another case in which the court broadly construed its jurisdiction to prevent injustice to local unions and the individuals within them. But the important point in Young v. Hayes is its holding that union officials are no more free to disregard the spirit of Title I of the L.M.R.D.A. than they are the precise language of that title. This, of course, has been the transgression in this case, generally speaking. That Court also shares this Court's concern for the prevention of abuses of power by union officials.

### VIII.   SCHRANK v. BROWN

Although the case of Schrank v. Brown, 192 Misc. 80, 80 N.Y.S.2d 452 (1948), was not decided under a federal labor law, it further illustrates judicial treatment of supposedly infallible powers held by those in high positions in unions. That case involved a suspension by the International President of the president of a local lodge of the Machinists' Union, and the "taking over" of the affairs of that Local. The plaintiff was seeking a temporary injunction. The court first recited what Professor Summers describes as "the litany of reluctance" to intervene in the internal affairs of unions. The court said, 80 N.Y.S.2d at 453–454:

> "The propriety of such action is of no concern to the court, since the internal affairs of a union will not be interfered with by the courts and the parties will usually be left to their recourse to the machinery for redressing wrongs in the union's rules. Where no power exists under the constitution of the union to act, the court will interfere in the first instance to enjoin an unwarranted exercise of power."

The court then went to work.. The International President had acted under a provision of the union constitution which was as follows, 80 N.Y.S.2d at 454:

> "The International President shall have the direction and supervision of all district and local lodges, with full authority to suspend individual members, or district or local lodges, for incompetency, negligence, insubordination, or other failure to properly perform their duties as members of this Organization and for violation of the provisions of the Constitution of the Grand Lodge or the constitution of local lodges."

Although the Court in granting the injunction noted that the letter dismissing the plaintiff and taking over the union did not charge any violations of the above duties and that there had been no hearing, the court addressed itself candidly to the underlying question, 80 N.Y.S.2d at 455:

> "Fair criticism is the right of members of a union, as it is the right of every citizen. A provision of a union constitution, which would suppress protests of members against actions of their officers which such members regarded as improper or opposed to their best interests, would be illegal and unenforcible."

The message is plain. No union constitutional power, however broad and strong, held by any union official, however high and mighty, will be allowed to impair freedom of speech within the union. This is the teaching of Schrank v. Brown, of Crossen v. Duffey,[58] of Mad-

---

58.   90 Ohio App. 252, 103 N.E.2d 769 (1951).

den v. Atkins,[59] and perhaps many other state decisions which protected freedom of speech in the union by other theories.[60] This is perhaps the teaching of Young v. Hayes,[61] and Moschetta v. Cross,[62] and this is certainly the firm foundation upon which the instant case rests. "The pervading premise of the L.M.R.D.A. is that labor organizations should function democratically." Note, Rights of Union Members: The Developing Law Under the L.M.R.D.A., 48 Va.L.Rev. 78, 81 (1962). Freedom of speech within the union is a right of the highest order. The scholars think so, the state courts think so, Congress thinks so, and this Court thinks so. If there are some union leaders who do not think so, then they will have to reconcile themselves to the hard fact that unions must be democratic. As the House committee report said, H.Rep. No. 741, 86th Cong., 1st Sess. 7 (1959):

> "The internal problems currently facing the labor unions are bound up with a substantial public interest. Under the National Labor Relations Act and the Railway Labor Act a labor organization has vast responsibility for the economic welfare of the indvidual members and other employees whom it represents. Union members and employees who are represented by labor unions have a vital interest, therefore, in union affairs. *Thus it is essential that union practices and procedure be democratic and that they recognize and protect the basic rights of the union members and the employees represented by unions."* (Emphasis supplied.)

It seems inevitable that questions will arise as to the exact nature of the freedom of speech which has been conferred by Congress. The Ohio court in Crossen v. Duffey indicated that the union might have the power to punish criticism which was libelous or slanderous. The New York court in Schrank v. Brown spoke of *fair* criticism. Professor Summers has indicated that the L.M.R.D.A. might punish unfair and slanderous criticism.[63] In any event, the question is not in this case, and this Court expressly refrains from indicating what the answer might be.

## IX. THE SCOPE OF SECTION 501 OF THE L.M.R.D.A.

The next question is whether Section 501 affords the type of relief desired here. More precisely stated, the question is twofold: (1) Whether Section 501 applies only to situations in which union officers have absconded with money or otherwise damaged the union, and (2) whether the previous phrase "other appropriate relief" in § 501(b) contemplates injunctive relief. The first point has been strongly argued here. The Respondents have quoted debate on the floor of Congress to support the proposition that the Congress, in using the words "other appropriate relief", did not intend that phrase to apply in any context save that involving money or property. In

59. 4 N.Y.2d 283, 151 N.E.2d 73 (1958).

60. See fn. 29, supra.

61. 195 F.Supp. 911 (D.D.C.1961).

62. 49 LRRM 2428 (D.D.C.1962).

63. "The most difficult problem arises when a member is expelled for "slandering a union officer." Union debates are characterized by vitriol and calumny, and campaigns for office are salted with overstated accusations. Defining the scope of fair comment in political contests is never easy, and in this context is nearly impossible. To allow the union to decide this issue in the first instance is to invite retaliation and repression and to frustrate one of the principal reasons for protecting this right—to enable members to oust corrupt leadership through the democratic process. The statute does not by its terms permit discipline for defamation; and accusations made in good faith do not necessarily violate the member's responsibility to his union as an institution. The trust of the statute may prohibit discipline for defamation and limit the union officer who claims he is defamed to the normal legal remedies in the courts." Summers, American Legislation for Union Democracy, 25 Modern L.Rev. 273, 287 (1962).

other words, any union officers could be compelled to account for any money or property which they might have misappropriated or stolen, but no broader relief could be had. Examination of the entire legislative history shows this position to be incorrect.

The Kennedy-Ervin bill, S. 1555, as reported and passed by the Senate, did not contain any significant fiduciary section. Senator Goldwater and others took strong issue with the lack of a strong fiduciary provison in S. 1555. Minority Views accompanying Report from Committee on Labor and Public Welfare, S. Rep. 187, 86th Cong., 1st Sess. 72, 87 (1959).

Senator McClellan proposed an amendment on the floor of the Senate on April 22, 1959, and the full text of this amendment is as follows, 105 Cong.Rec. 5854 (daily ed. April 23, 1959):

> "Every officer, agent, or other representative of a labor organization engaged in an industry affecting commerce, or of a trust in which such organization is interested, shall, with respect 'o any money or other property in his custody or possession by virtue of his position as such officer, agent or representative, have a relationship of trust to any such labor organization and the members thereof, or to any such trust and the beneficiaries thereof, and shall be responsible in a fiduciary capacity for such money or other property, notwithstanding any grant of authority purporting to exempt him from such responsibility."

This amendment is the basis of the congressional debate relied on by counsel for Respondents. The Respondents' quotations suggest that Congress was concerned only with the misuse of union funds by union officers and the recovery of such funds by or for the benefit of the union because the proposed amendment sought to impose fiduciary duties only with respect to money or other property in possession of a union official by virtue of his office. The above quoted amendment was adopted as Section 610 of S.

1555 as it passed the Senate on April 25, 1959. S. 1555, 86th Cong., 1st Sess. 61–62 (1959). Yet it is not found anywhere in the Act as it was finally passed.

In the House of Representatives four bills were introduced. The Kearns bill, H.R. 7265, introduced on May 20, 1959, contained a fiduciary provision somewhat broader in scope than that contained in S. 1555. H.R. 7265, 86th Cong., 1st Sess. 24 (1955). On July 23, 1959, the Elliott bill, H.R. 8342, was introduced. Its broad fiduciary provision contained language which was identical, verbatim, with that now contained in § 501 of the Act. H.R. 8432, 86th Cong., 1st Sess. 44–46 (1959). The Elliott bill was not reported out of committee with a majority vote. However, on July 24, 1959, the Landrum-Griffin bill, H.R. 8400–8401, was introduced. Its fiduciary provision was identical with that contained in the Elliott bill, and this language is, of course, that which was ultimately adopted and presently appears in § 501 of the Act. See H.R. 8400, 86th Cong., 1st Sess. 42–44 (1959); 105 Cong. Rec. 13125 (daily ed. July 27, 1959). On August 3, 1959, the Shelley bill, H.R. 8490, was introduced. Its fiduciary provision was restrictive in scope and was narrower than that contained in the Kearns bill. H.R. 8490, 86th Cong., 1st Sess. 46–48 (1959).

The Landrum-Griffin bill was adopted in toto by the House as an amendment to the Elliott bill, H.R. 8342, on August 13, 1959. 105 Cong. Rec. 14519–20 (daily ed. Aug. 13, 1959). Since the Elliott bill was the only bill reported by a committee of the House, and since its fiduciary provisions were identical with those in the Landrum-Griffin bill, the following statements in H.Rep.No. 741 on H.R. 8342 demonstrate the intent to achieve broad fiduciary coverage, H.Rep.No. 741, 86th Cong., 1st Sess. 10 (1959):

> "The committee bill also contains provisions dealing with breaches of trust and other questionable transactions, which, although not seriously criminal, nevertheless are incompatible with a strong and honestly run labor movement.

"For centuries the law of fiduciaries has forbidden any person in a position of trust subject to such law to hold interests or enter into transactions in which self-interest may conflict with complete loyalty to those whom he serves. Such a person may not deal with himself, or acquire adverse interests, or make any personal profit as a result of his position. The same principle has long been applied to trustees, to agents, and to bank directors. It should be equally applicable to union officers and employees."

It is stated further in the Supplementary Views to this Report, H.Rep.No. 741, 86th Cong., 1st Sess. 81 (1959):

"Union officials occupy positions of trust. They hold property of the union and manage its affairs on behalf of the members. It is the duty of union officers just as it is the duty of all similar trustees to put their obligations to the union and its members ahead of any personal interest.

"The committee bill sets forth this principle unequivocally and declares that union officers and agents occupy positions of trust in relationship to labor organizations and their members. It then sets forth their duties in terms which the common law applies to all persons who undertake to act on behalf of others:

"' * * * to hold its money and property solely for the benefit of the organization and its members and to manage, invest and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization.'

"*We affirm that the committee bill is broader and stronger than the provisions of S. 1555 which relate to fiduciary responsibilities. •S. 1555 applied the fiduciary principle to union officials only in their handling of 'money or other property' (see S. 1555, sec. 610), apparently leaving other questions to the common law of the several States. Although the common law covers the matter, we considered it important to write the fiduciary principle explicitly into Federal labor legislation. Accordingly the committee bill extends the fiduciary principle to all the activities of union officials and other union agents or representatives.* (Emphasis supplied.)

"The general principles stated in the bill are familiar to the courts, both State and Federal, and therefore incorporate a large body of existing law applicable to trustees and a wide variety of agents. The detailed application of these fiduciary principles to a particular trustee, officer, or agent has always depended upon the character of the activity in which he was engaged. They bear upon a family trustee somewhat differently than a corporate director, upon an attorney quite differently than a real estate agent. The bill wisely takes note of the need to consider 'the special problems and functions of a labor organization' in applying fiduciary principles to their officers and agents."

The author of the Elliott bill, in referring to the fiduciary provisions therein contained and presently found in § 501 (a) of the Act, stated, 105 Cong.Rec. 14212 (daily ed. August 11, 1959):

"Our Committee on Education and Labor made, I think, a major contribution by adding the language now found in section 501(a) which language was not in the Senate bill. *We wrote a comprehensive statement of the fiduciary duties of union officers.* The assets of a labor un-

ion belong to the members. Union office is a position of trust to be used for the benefit of the members. In collective bargaining, and in conducting other business, union officers must put their fiduciary obligations ahead of their personal interest." (Emphasis supplied.)

Further argument is unnecessary; the Landrum-Griffin bill as passed by the House extended the fiduciary principle to *all* the activities of union officials and other agents or representatives.

After the Landrum-Griffin bill was approved in the House, a conference was called to try to reconcile this latter bill with the Kennedy-Ervin bill as passed by the Senate. The report from the House conferees said only that Section 501 as passed by the House had been agreed upon as an amendment to the Senate bill by all the conferees. H.Rep. 1147, 86th Cong., 1st Sess. 31 (1959). The Senate conferees did not submit a report to the Senate from the committee of conference, but Senator Kennedy, in reporting to the Senate on the Landrum-Griffin bill as it emerged from the Conference Committee, stated, 105 Cong.Rec. 16415 (daily ed. Sept. 3, 1959):

"The general principles stated in the bill are familiar to the courts, both State and Federal, and therefore incorporate a large body of existing law applicable to trustees, and a wide variety of agents. The detailed application of these fiduciary principles to a particular trustee, officer, or agent has always depended upon the character of the activity in which he was engaged. They bear upon a family trustee somewhat differently than a corporate director, upon an attorney quite differently than a real estate agent. The bill wisely takes note of the need to consider "the special problems and functions of a labor organization" in applying fiduciary principles to their officers and agents.

"The bill does not limit in any way the purposes for which the funds of a labor organization may be expended or the investments which can be made. Such decisions should be made by the members in accordance with the constitution and bylaws of their union. Union officers will not be guilty of breach of trust under this section when their expenditures are within the authority conferred upon them either by the constitution and bylaws, or by a resolution of the executive board, convention or other appropriate governing body—including a general meeting of the members—not in conflict with the constitution and bylaws. This is also made clear by the fact that section 501(a) requires that the special problems and functions of a labor organization be taken into consideration in determining whether union officers and other representatives are acting responsibly in connection with the statutory duties. * * *

"However, the committee bill also explicitly invalidates any general provision in a union constitution or bylaws purporting to excuse union officials from breaches of trust. The bill follows the well-established distinction between conferring authority upon an agent or trustee, which is permissible and protects him against liability, and attempting to excuse breaches of trust, which is here made void as against public policy."

Examination of Senator Kennedy's remarks shows that he was reading from the supplementary report (quoted in part supra) filed by Representative Elliott and his co-authors to accompany the Elliott bill to be reported out by the Committee on Education and Labor. Senator Kennedy began with the fourth paragraph and did not read that report verbatim, but the modifications are not pertinent here. See Dugan, Fiduciary Responsibilities Under the New Act, 48 Georgetown L.J. 277, 292 (1959). It is thus clear that the House and the Senate were in accord as to the meaning of Section 501.

▇ Returning to the questions previously posed, the first one has been answered by the italicized portion of H.Rep.

No. 741, supra, at page 81. That language pointed out that the fiduciary principle of S. 1555 applied only to money and that the Elliott bill was "broader and stronger." When Senator Kennedy started reading that report on the floor of the Senate, he began at the next succeeding paragraph from the one containing the above remarks but that certainly does not impair the force of those remarks. Senator Goldwater described the new section 501 as follows, 105 Cong.Rec. 15120 (daily ed. Aug. 20, 1959):

> "The House bill makes it clear that members may sue for violations of all the fiduciary duties imposed by the bill, not just theft, embezzlement, and unlawful conversion, as provided in the Senate bill."

The first question must therefore be unequivocally answered in the negative. Section 501 does *not* apply only to situations in which union officers have absconded with money or the like. Parks v. International Bhd. of Elec. Wrkrs., 203 F.Supp. 288, 296 (D.Md.1962).

■■■■ The second question—is injunctive relief available under Section 501(b)—must be deemed answered by Senator Kennedy's previously quoted opening paragraph in his discussion of Section 501. (This is the fourth paragraph in H.Rep. No. 741, supra at 81). Senator Kennedy said in part, "The general principles * * * incorporate a large body of existing law applicable to trustees. * * *" The question whether existing trust law contains authority for injunctions against trustees is answered in the affirmative by a casual perusal of Scott on Trusts, which is expressly mentioned on page 82 of the previous report. It is hornbook law that trustees can be enjoined both to do their duty and also to refrain from violating their duty.

A helpful body of precedents here are the general principles of constructive trusts. See 4 Scott on Trusts §§ 461–552 (2d ed. 1956). This large collection of rules, dealing extensively with injunctions and similar relief, affords analogous support to the remedy sought by the Petitioners in this case. A quotation by Prof. Scott of the words of Judge Cardozo is quite pertinent here. "A constructive trust is then the remedial device through which preference of self is made subordinate to loyalty to others." 4 Scott on Trusts 3102 (2d ed. 1956). This case is certainly one in which preference of self on the part of the Respondents in desiring to assert their power in Local 386 will have to be somewhat subordinated to the lawful wishes of those who elected them.

With Scott on Trusts in the legislative history and the words of Judge Cardozo thus only one or two steps removed from the printed page of the House committee report supra, it is difficult indeed to believe that this Court or any other is narrowly confined in the "other appropriate relief" that might be awarded under Section 501(b). Senator Kennedy was somewhat understating the matter when he said, "The general principles stated in the bill are familiar to the courts. * * *" The stirring phrases of Judge Cardozo are indelibly written into the law for posterity. Among his never-to-be-forgotten words are those in Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546, 62 A.L.R. 1 (1928), where he said:

> "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. * * * Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

The facts of this case do not seem to call for the application to these Respondents of so strict a standard of loyalty, but it does seem that the end sought by Judge Cardozo in that context is the same as that desired by the Congress in this one, e. g., the prevention of erosion and undermining of "the rule of undivided loyalty." Any doubts will be quickly dispelled by recalling the words of H.Rep. No. 741, supra, at p. 10:

"For centuries the law of fiduciaries has forbidden any person in a position of trust subject to such law to hold interests or enter into transactions in which self-interest may conflict with complete loyalty to those whom he serves. *Such a person may not deal with himself, or acquire adverse interests, or make any personal profit as a result of his position.*" (Emphasis added.)

The Supplementary Views to this report are to the same effect, H.Rep. No. 741, supra, at p. 81:

"Union officials occupy positions of trust. * * * The committee bill sets forth this principle *unequivocally* * * *." (Emphasis added.)

There can indeed be no doubt that the mood of Congress was emphatic.

The "feeling" in the Congress is perhaps illustrated by some remarks by some members of the McClellan Committee. Senator Ervin, a member of this Committee, was also one of the co-sponsors of the Kennedy-Ervin bill, S. 1555, which was the first labor reform bill to be introduced in the first session of the 86th Congress, i. e., in 1959. Senator Ervin outlined, in remarks printed in the margin, what he conceived to be the six most prominent forms of abuse of power in the union movement.[64] Remarks of Sen-

64. "For 2 years I have served upon the Senate Rackets Committee, which has been presided over so ably and courageously by a truly great American, Senator JOHN L. McCLELLAN. This committee has investigated some 20 unions which act as collective bargaining agents for several million men and women employed in industries affecting interstate commerce.

"The testimony taken by the committee has shocked the conscience of the Nation.

"This is true because the testimony has made it crystal clear that some or all of the following have occurred upon frequent occasions in some of the unions investigated:

"First. Union moneys in enormous amounts have been converted to their own use or that of their cronies by union officers whose duty it was to safeguard them.

"Second. Union officers committing such raids upon union treasuries have destroyed union records to conceal their financial misdeeds from union members, income tax authorities, law enforcement officers, and investigating committees.

"*Third. Union members have been deprived of any real voice in the election of union officers or the management of union affairs by dictatorial activities of union officers, undemocratic regulations, wanton abuse of the trustee process, and even, on occasion, sheer terrorism.* (Emphasis supplied)

"Fourth. Persons convicted and sentenced to prison for armed robbery, burglary, extortion, and other infamous crimes have been placed in positions of authority over honest and law-abiding union members shortly after their release from prison and before they had brought 'forth fruits meet for repentance.'

"Fifth. Union charters have been granted to known racketeers and their associates, who have used them as devices to prey upon the public and helpless workers compelled to earn their bread in the sweat of their brows.

"Sixth. Union officers and agents of employers have entered into conspiracies resulting in sweetheart contracts or other arrangements which constituted betrayal of the union members by officers, who were supposed to represent them.

"The great majority of union officers do not countenance or tolerate malpractices of these types in the areas in which they have the power to act. Nevertheless, the testimony taken by the Senate Rackets Committee shows that such malpractices are widespread in some segments of the union movement, and that they will undoubtedly continue unless they are outlawed by Congress. After all, John Stuart Mill was right when he said: 'Laws and institutions require to be adapted, not to good men, but to bad.'

"For these reasons, there is a crying need at this hour for congressional action outlawing the malpractices I have enumerated.

"It is obvious that if Congress is to do this, it must enact a statute regulating to a limited extent the internal affairs of

ator Mundt,[65] the vice chairman of the McClellan Committee, and Senator Church,[66] also indicate the outrage which these Senators felt after probing deeply into the affairs of five labor unions. The remarks of Senator McClellan, the chairman of that committee, cannot be relegated to a footnote; they are of such gravity—and such significance to this case—that they must occupy a prominent position in this opinion. Senator McClellan said in part, 105 Cong.Rec. 5804–05 (daily ed. April 22, 1959):

" * * * I have occupied a position in the Senate which carries with it what I consider to be a great honor; that is, to be the chairman of a select committee which was created more than 2 years ago and given an assignment, a duty to perform, a mission to carry out for this great body, namely, to inquire into the criminal actions and improper practices which might be going on in labor-management relations.

"For some 26 months the committee has functioned, and it is functioning in the 27th month. I believe the committee has functioned effectively. I know it has functioned constantly. * * *

"The evidence is recorded in many volumes of testimony. I think there are now about 45 volumes of public hearings. After hearing more than 1,200 witnesses, I believe I can say to the Senate and to the country today that the committee has produced a record, which it has brought to the Senate and to the entire Congress, and which gives the facts and the information the Congress wanted and needed so that it might be informed as to what is happening, and so that it might become acquainted with the conditions which prevail in order to legislate intelligently to remedy and to correct conditions, where such correction was indicated by the facts. * * *

"Yes, Mr. President, for more than 2 years members of the select committee, Members of Congress, and the citizens of this country generally have been shocked and nauseated by the disclosures of impositions and abuses which have been perpetrated upon the working people of many of our States by the thugs who have muscled into positions of power in labor unions and who masquerade at [sic] labor leaders and as a friend of working people. The forms these impositions and abuses have taken are now familiar to all of us by countless repetitions such as: The

unions." 105 Cong.Rec. 5489 (daily ed. April 16, 1959).

**65.** " * * * Many individuals closely associated and intimately acquainted with labor-management relations in the United States have recognized for a considerable time the essential need for expansion and modification of the Federal statutes dealing with labor-management relations. But it was not until the hearings and investigations conducted by the McClellan rackets committee that the general public became thoroughly acquainted and aware of the widespread corruption and racketeering which exists in the labor-management field. I have served on the McClellan committee since its creation and I am currently serving as the vice chairman of that committee. I entered my duties as a member of the McClellan committee with complete objectivity and as somewhat of a novitiate in the field of labor relations. I have been profoundly shocked by the disclosures of corruption,

violence, union-boss autocracy, and racketeerism which have been made before the McClellan committee. * * * " 105 Cong.Rec. 5639 (daily ed. April 20, 1959).

**66.** " * * * Under the able chairmanship of the distinguished senior Senator from Arkansas [Mr. McCLELLAN], this committee has systematically exposed the sordid facts of corruption, racketeering, and unbridled personal power in the Teamsters' Union and in certain other parts of the labor movement. Month after month I have sat with the committee, assisting in the interrogation of a parade of gangsters, thugs, and hoodlums—and their victims—who have been called to testify before us. Many of these racketeers are feasting upon the earnings of honest working men and women. The exposure of these robber barons was long overdue, and I am proud to have had a role to play in exposing them. * * * " 105 Cong. Rec. 5727 (daily ed. April 21, 1959).

capture or purchase of local unions; the denial of democratic processes in the unions; the denial of freedom of speech and freedom of assembly by union members; the denial of the right to vote and to have any voice in the selection of officers; the denial of a voice in the formulation and adoption of policies; brutal, physical violence, vandalism, instilled fear, and economic coercion, used to silence objectors; the use in some instances of union funds to corrupt public officials; the direct extortion of money from small businessmen, who are peculiarly vulnerable to racket union shakedown tactics; the looting of union treasuries and welfare funds; the use of trusteeships for power purposes; forcible top-down organization by compelling employers to violate the legal and moral rights of their employees by delivering them under contract to the unions without their knowledge in many instances, and in others against their will and without their consent; the appointment of known criminals and unreformed convicts to positions of trust and authority over rank-and-file union members; or some combination of any or all of these practices. What I have named are not isolated instances.

"Mr. President, I do not want anything in this RECORD to reflect that it is my view at all that all unions are 'crooked' or that all labor leaders are 'crooked.' I am confident the great majority of them are honest, dedicated persons. But, Mr. President, the great majority of American citizens are also honest, dedicated persons; and yet we have laws for the protection of our people. We need in this instance laws to correct some of the conditions to which I have just referred.

"The select committee's hearing record is replete with many and varied forms of such improper acts, improprieties, and even crimes against rank-and-file union members.

"Yes, I think it can be said without successful challenge that two main facts emerge from the voluminous record the select committee has compiled: almost invariably the abuses, the compulsions, thievery, thuggery, skulduggery, and sometimes skull-splitting tactics are practiced against workers—certainly more often than against employers—and the arbitrary powers over workers thus acquired by such tactics almost invariably are used, or misused, for personal aggrandizement, power, and personal enrichment.

"Some of the so-called unions that resort to such acts are, in fact, more like businesses operated for private profit rather than unions for the benefit and welfare of the workers. The profit is made and goes into the hands of individuals by the ruthless exploitation of workers and by the cynical perversion of unionism. Thus, the only resemblance between such corrupt unions and decent legitimate unions is that both are treated alike by the law; both have the same exemptions and privileges under the law; and both have the same unrestrained tremendous powers.

"Most unions use these powers with propriety, or at least measures of restraint, but some do not. But it is the possession and the present lack of adequate regulation of these powers which invites corruption and which makes the union movement attractive in some instances and profitable for exploitation by the racketeers, the corrupt, and the unscrupulous.

"No one knows how many thousands or even millions of workers are the victims of such exploitation or how many more workers may readily become victimized if effective laws are not passed to prevent it. Mark this well, however; no one is immune. The invasion of unionism by thugs and hoodlums has gone much further

and is more extensive than we may think.

"The Senate select committee has barely scratched the surface. Sometimes we hear comments to the effect that the Senate select committee has looked into only about a dozen unions; that there are several hundred unions in the country, and therefore this is a small matter. That is true with respect to the number of unions, but again I assert that no doubt the great majority of unions and union leaders are honest and dedicated, but the largest and most powerful union in the country today, the one which is seeking more and more power, power paramount over that of Government itself, is beyond all doubt corrupt. There can be no question about that. More than 1½ million persons are members. Practically all of them are honest, decent citizens; but they are in a vise, and must have some relief."

After some discussion with Senator Ervin, Senator McClellan further said in part, 105 Cong.Rec. 5806:

"The situation is sickening. It is almost impossible to believe that some of these things are happening in America.

"A moment ago I stated that the Senate select committee had barely scratched the surface. For every case that has been investigated, there are literally hundreds of complaints that the committee has not had the time and the resources to touch. They still come in. A number of them are individual cases, but others involve whole unions. Notwithstanding the fact that during the 27 months since the committee was created it has held approximately 250 days of public hearings, it has been impossible for the committee to process all the complaints. We shall never be able to get around to all of them.

"We do know, however, that every worker in the country is a potential victim; every union man who is not protected by effective law which he can use against beatings and tortures and job-loss as reprisals for assembling, for speaking up in meetings, for making inquiry about the financial affairs or other actions of his union or its governing body is a potential victim; every citizen of the Nation is a victim to a degree of the consequences of the spread of corruption; and the most tragic potential victim of all is the honest, decent, idealistic union movement itself. * * *

"The workers of our country, indeed, all the people of our country, are looking to us for relief. They are looking to us in the Congress to do something about this evil, and they are looking to us for relief from the evils associated with these parasites upon unionism.

"They are entitled to effective relief. If we give these evils only superficial treatment and do not apply an adequate remedy as the chosen representatives of the American people, we will have been derelict in duty and failed in our responsibility. They have a right to expect, and we are under obligation to produce, something better than the illusory word 'reform' as a cure for the ills that we know exist. * * * *"

Although the foregoing remarks by the other Senators were directed towards passage of S. 1555, Senator McClellan was speaking in behalf of an amendment, S. 1137, to provide, inter alia, a bill of rights for the union member. Senator McClellan further said, 105 Cong.Rec. 5806 (daily ed. April 22, 1959):

"* * * If this bill should be enacted into law, it would bring to the conduct of union affairs and to union members the reality of some of the freedoms from oppression that we enjoy as citizens by virtue of the Constitution of the United States, which incidentally does not make an exception for union members.

"Sometimes the question is asked, 'Why should we enact legislation protecting such rights for union members and not for members of any other organization?' I think the answer is twofold. In the first place, the justification and certainly the desirability for unionization is the fact that the individual worker in an industrial economy has little or no power, when he stands alone, to deal effectively with his corporate employer. It is through unionization and bargaining collectively that he is able to make himself heard at the bargaining table. It seems clear, therefore, that this justification becomes meaningless when the individual worker is just as helpless within his union as he was within his industry, when the tyranny of the all-powerful corporate employer is replaced by the tyranny of the all-powerful labor boss. The worker loses either way.

"Second, I deem it appropriate that we insure by law internal democracy in unions and provide for proper protection of union members and their rights, because unions themselves exist and operate under powers and protection conferred by the Federal Government in a unique manner and to an unequal degree. Once a union has been certified by the National Labor Relations Board, for example, the employer is compelled to bargain with that union as the exclusive representative of all the workers within the bargaining union, irrespective of whether they are members of the union or not. If unions are to have such federally bestowed, tremendous powers in industrial government, they should be compelled by law to represent their members in accordance with democratic principles and to accord to them the basic rights of liberty, freedom, and justice.

"Union members are supposed to be freemen too, and they are entitled to legislative protection from autocratic rule, from personal violence, from corruption, and from threats and intimidation intended to deprive them of those rights to which they are justly entitled.

"If they are protected by law, as I propose that we do, then no longer will a man have to cringe in terror because he may have spoken a word that offended a petty tyrant, or because he asked the wrong question, or because he wants to know where his dues money went.

"Mr. President, one of the most salutary effects of S. 1137 would be its effect upon the quality of union leadership.

"The strongest support for the provision of S. 1137, and particularly the bill of rights provisions, should come from decent traditional union leaders. It will protect them from the assaults of those who would capture their unions. And I may say, Mr. President, that if present trends are not checked and if powers now in the hands of such men as Hoffa and his ilk, are not restrained —make no mistake about it—the day is swiftly approaching when that group and that element will gobble up decent unionism in this country, and the Meanys and others whom we respect and whom we feel represent the best in unionism today will be supplanted by the Hoffas, the Brennans, the Duoguardias, and men of their stripe.

"When that day comes, Mr. President—and I say this in all seriousness and solemnity—we will not be here on the floor of the Senate debating whether we will provide the individual working dues-paying members with a bill of rights; when that day comes, Mr. President, we will not be here debating any issue with respect to the rights of the laboring man; those rights will have already been destroyed, and it will be too late.

"Before I conclude my remarks, I shall show the Senate cumulative

proof to support exactly what I am saying. I am warning, with all the force at my command, my colleagues and the country that we are in danger from within from the elements about which I speak today.

"In many instances the temptation of the privilege to compel men to yield him unrestrained power and personal riches attracts to the unions a certain kind of officer—the boss type. The prosaic processes of persuasion and service have little or no appeal to such a man. Why do hoodlums and racketeers and the criminal element of the type I have indicated infiltrate unions? Why do they do it? There is something there which is attractive to them. What is it? It is power. What is it? It is the opportunity to get rich by the exploitation of other men. That is what it is. We are either going to deal with it now, or, if we fail to deal with it effectively, we are not meeting our responsibility.

"The type of person I have referred to has no concern for the workingman. That type of person exploits the workingman. Some of these "bosses" have businesses of their own. They threaten strikes.

"That is the kind of person against whom we propose to legislate; not the good union leader; not the good union officers. Certainly if we do not legislate against the good ones, we must legislate against the bad ones, the ones who have the tendency or the temptation to commit crimes.

"I believe it reasonable to expect that the removal of temptation, the ending of autocratic rule by placing the ultimate power in the hands of the members, where it rightfully belongs, so that they may be ruled by their free consent, may bring about a regeneration of union leadership. I believe the unions should be returned to those whom they were designed to serve; they should not be left in the hands of those who act as masters. The unions must be returned to their members, to whom they rightfully belong.

"I do not believe that unions in our society are supposed to be, or that they should be, permitted to be masters of the members. Unions should be the servants.

"Our basis labor policy is grounded in freedom of choice. In it we sought to make effective full freedom of association, with the right assured to associate or not to associate, to participate in collective action, or not to participate, according to the free decision of each individual for himself, without either restraint or coercion from any source. That Mr. President, is a sound policy. It is a policy that represents the rights of men and respects the dignity of man. In my judgment it is the only policy consistent with a free society. * * *

Senator McClellan must certainly be regarded as an authority on the subject on which he was speaking, if the remarks of his fellow Senators are any indication of the time and effort which he had expended on the task or the service which they thought he had rendered.[67]

67. "Mr. GOLDWATER. It has been my happy privilege during my 7 years in the U. S. Senate to have served on two select committees with the distinguished Senator from Arkansas [Mr. McCLELLAN]. The first was the one created to investigate campaigning and lobbying, and the other, of course, is the famous McClellan committee investigating labor and management practices.
"I would be remiss in my duty to my conscience today if I did not tell my colleagues of my high opinion of Senator McClellan. He has applied himself assiduously—I may say completely—to those responsibilities. He has worked far harder than has any other chairman with whom I have come in contact. I cannot recall one meeting of either of the two committees I have named when the Senator from Arkansas was not in attendance. I think he has attended every meeting of the McClellan rackets committee. He stands today on the floor of the Senate

■ To paraphrase the words of Senator McClellan, Congress did decide that the physical violence, instilled fear and economic coercion must stop. But all of the previously quoted words show clearly why Congress went further than that—why Congress said that the union official occupied a position of trust with a high standard of fiduciary responsibility imposed upon it. Congress was fed up with the disregard of the rights of the union member; Congress was incensed at the conduct of union officials unconcerned with the responsibilities of their office. Congress wished to stop the outrageous conduct of the thugs and the gangsters, but Congress also wished to stop lesser forms of objectionable conduct by those in positions of trust. In the place of corruption, greed, and large and small abuses of power Congress wished to substitute obedience to a high standard of honor and loyalty to the union member whom the union official was chosen to serve.

Section 501 might be re-examined. It is a simple provision; it affords the necessary flexibility. The first sentence seems to provide the basic thrust. It provides: "The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group." The duty is imposed by the three simple words "positions of trust." These words are only slightly more self-explanatory than the words "due process" in the United States Constitution. But can there be any doubt of the force, scope, and efficaciousness that Congress intended these words to have? Does not the McClellan Report make clear that there is a strong public interest in compelling those in positions of trust to strictly honor the requirements of union democracy? Do not the words of Senator McClellan himself make very clear that our very way of life might well be in danger if those in positions of power are not required to strictly adhere to the duties and responsibilities of their offices? This Court is well aware that Senator McClellan was not talking specifically about Section 501 as it was ultimately enacted. This Court is also aware that the fiduciary measure proposed by Senator McClellan did not extend beyond financial responsibility. But what did Senator McClellan intend to bring about when he referred to the " * * * impositions and abuses which have been perpetrated upon the working people of many of our States by the thugs who have muscled into positions of power in labor unions and who masquerade at [sic] labor leaders and as a friend of working people"? 105 Cong.Rec. 5805 (daily ed. April 22, 1959). What did Senator McClellan want to stop when he referred to " * * * the abuses, the compul-

as an authority in the field we have been investigating, knowing more about it than do any of the others of us. * * * "
"Mr. CURTIS. I join the distinguished Senator from Arizona in paying tribute to the chairman of the committee, the Senator from Arkansas [Mr. McCLELLAN]. So often it happens that visitors will attend a session of the labor rackets committee and, upon leaving, will say, 'How can you stand this day after day?'
"I think that is significant of the difficult task which the Senator from Arkansas [Mr. McCLELLAN] has performed. He has been present at and has presided over almost every session of the committee. He has been patient with all. He has given of his time and talents far beyond the demands of serving the economy and the welfare of the State of Arkansas. That service he has rendered well, but he has, in addition, rendered a service to the entire country. He has pointed up a series of problems which, if not corrected, will lead to a gangster economy in this country and will add to the inflationary trends, pushing the public interest far into the background. * * * "
"Mr. BRIDGES. I desire to join with others of my colleagues in paying tribute to the distinguished Senator from Arkansas [Mr. McCLELLAN] who is a truly great and courageous American. In the conducting of his hearings during the past several years he has rendered an inestimable public service, and has made an invaluable contribution to his country. I hope the Senator's recommendations in the labor-management field will receive the thoughtful consideration and support of the Senate. * * * " 105 Cong.Rec. 5809 (daily ed. April 22, 1959).

sions, thievery, thuggery, skulduggery and sometimes skull-splitting * * *"? 105 Cong.Rec. 5805 (daily ed. April 22, 1959). What end was Senator McClellan seeking when he referred to the " * * denial of democratic processes in the union; the denial of freedom of speech and freedom of assembly by union members; the denial of the right to vote and to have any voice in the selection (of) officers; the denial of a voice in the formulation and adoption of policies; brutal, physical violence, vandalism, instilled fear, and economic coercion, used to silence objectors * * *"? 105 Cong. Rec. 5805 (daily ed. April 22, 1959). There is no need to go on. The meaning is clear. Senator McClellan and the Congress wished to bring about a drastic change in the conduct of those in "positions of trust." As the House committee report said, "Racketeering, crime and corruption must be stamped out in the labor-management field as elsewhere." H.Rep. No. 741, 86th Cong., 1st Sess. 9 (1959).

What is the effect of these words and all the others upon the three simple words in the first sentence of Section 501 of the L.M.R.D.A.? What scope and force did Congress intend those words to have? The answer is plain. Section 501 is no parsimonious dole by the Congress, to be in turn niggardly measured out by the Federal courts. Congress meant the remedy to be no less sophisticated than the problem—the cure to be co-extensive with the malady. To paraphrase Senator Kennedy's reading of the House committee report, "The detailed application of these fiduciary principles to a particular trustee, officer, or agent [depends] upon the character of the activity in which he [is] engaged." 105 Cong.Rec. 16415 (daily ed. Sept. 3, 1959). The second sentence of section 501(a) embodies this same principle. Thus armed, it is difficult to see any limitations which confront this Court in enforcing the mandate of the L.M.R.D.A. in this case. It seems certain that there are limits, but it seems equally certain that they are not overly inhibiting.

## X. THE REMEDY IN THIS CASE

There is no need, however, for this Court to delineate the boundaries of the L.M.R.D.A.; that duty resides elsewhere. It is enough to observe that the remedy in this case does not transgress those boundaries. Indeed, it does not even seem to approach them. There is in addition no need to probe the vast arsenal at hand to find the proper remedy. This is not a case in which the Petitioners are asking this Court to decide what is good for their Local Union or to fashion other novel relief. These Petitioners are asking this Court to enforce what the Local Union has already decided is for its own good. "Judicial inventiveness" is not necessary to decide that the lawful wishes of a union should be carried out— that union officers are to obey their constituency. Cf. Moschetta v. Cross, 48 LRRM 2669 (D.D.C.1961). One does not have to have the conscience of a Cardozo to conclude that local union officers have acted adversely when they have solicited orders from higher levels as excuses for not carrying out their duties. The misconduct is indubitable and the remedy is obvious. To once more paraphrase the words of Senator Kennedy, "The detailed application of these fiduciary principles * * * [depends] upon the character of the activity in which [the union officer has been] engaged." In this case these Respondents have been engaged in writing letters to the General Executive Board and the General President when they should have been writing checks to these Petitioners. The remedy is thus a simple one.

Of course, in order to reach these Respondents it has been necessary to set aside the letter of November 15, 1961, from the GEB. This letter is not a particularly "tyrannical" letter. The people who solicited it are certainly not of the ilk of the thugs and gangsters who made up the sordid parade of corruption which passed before the McClellan Committee. The people who wrote it are probably not either. This letter could perhaps be set aside in a variety of ways

which have previously been adverted to, but this Court prefers to make it very clear that no union official or officials have the power to even slightly impair freedom of speech within the union hall. This Court believes that it has firm authority for this position. This Court has studied the few cases available under the L.M.R.D.A. and their meaning is clear. This Court has read most of the writings of Professor Clyde W. Summers, a prolific scholar of fifteen years experience in this field. His thesis is also clear. This Court has read the words of Godfrey Schmidt, a lawyer and teacher who has lived in day-to-day contact with the most corrupt of the American labor unions. His thesis is that of Professor Summers: Protect the union member in his exercise of the right of criticism in the union hall. This Court has read the three reports of the McClellan Committee, which for over two years watched a tragic drama of greed, corruption and abuse of power in the union movement unfold before its unbelieving eyes. This Court has read the words of Senator McClellan and others on that committee. The words of Senator McClellan are not of the sort to be casually considered and possibly overlooked. They are words of warning to us all. They may be hard to believe, but Senator McClellan was there. He had the witnesses before him. He observed the corruption which is now but a small part of the overall American labor movement which has distinguished itself in its service to its members and to mankind in general. He told the Congress to protect the union member; he told the Congress that if the remainder of the union movement fell under the tyrannical control of the union thugs and gangsters, then the rest of us would not long be free. Congress heeded these words; Congress said that unions must be democratic— that the right of criticism must be protected. This letter of November 15, 1961, is inconsistent with that thesis, and this Court feels that it would be remiss in its duty if it did not vigorously strike this letter down. This letter may be no more than the mere hint of erosion of rights conferred by Congress, but this Court, recalling the words of all who have adverted to this problem, feels that the slightest suggestion of harm to union democracy must be met with a strong rebuttal if the will of Congress is to be carried out in this vital area. This Court does not believe that there has *yet* been tyranny in this case of the sort described by Senator McClellan. This Court does believe that the sort of activities engaged in by these Respondents, when coupled with the assistance of the national governing body of this union, are of the type that could ultimately pave the way for tyranny and domination of the members of both this local union and others.

## XI. THE ANALOGY OF SECTION 501(b) TO A STOCKHOLDER'S DERIVATIVE SUIT

One point remains. In the Lincoln Mills case, supra, the Supreme Court said, " * * * [S]tate law, if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy." 353 U.S. at 457, 77 S.Ct. at 918, 1 L.Ed.2d 972. The question is whether there is any state law which can be of assistance here. The answer is obtained from examination of the common law relating to stockholder derivative suits. A union member's suit under § 501(b) seems analogous to that of a derivative stockholder's suit against corporate officers in which a corporate right of action is asserted. Wollet, Fiduciary Problems Under Landrum Griffin, New York Univ. Thirteenth Annual Conf. on Labor, 267, 268 (1960). The right belongs to the union; it can be asserted by the individual only after the union has been requested to do so. Section 501(b), 29 U. S.C.A. § 501(b). The theory of a derivative suit is much the same. In 13 Fletcher, Cyclopedia Corporations 414 (Rev.Ed. 1961), it is said:

"The stockholders have a right in equity to compel the assertion of a corporate right of action against the directors or other wrongdoers when

the corporation wrongfully refuses to sue. The suit is thus an action for specific performance of an obligation owed by the corporation to the stockholders to assert its rights of action when the corporation has been put in default by the wrongful refusal of the directors or management to make suitable measures for its own protection."

This analogy is somewhat supported by repeated reference in the legislative history to the similarities between the duties of a union official and a corporate officer. See H.Rep. No. 741, 86th Cong., 1st Sess. 81 (1959); 105 Cong.Rec. A 6573 (daily ed. July 29, 1959). See also Dugan, Fiduciary Obligations Under the New Act, 48 Georgetown L.J. 277, 279 (1959).

■■■ It is argued here that the Petitioners are suing for their own benefit and that the analogy is not valid. This argument seems to overlook the fact that the Union received substantial benefit from the first federal action brought by these Petitioners. The terms primary and incidental benefit might be used (but with no small apprehension of the dangers inherent in these mechanistic terms). If the primary benefit was to these Petitioners, then the present suit is analogous to an individual stockholder's suit and would not be proper under Section 501(b). See 13 Fletcher, op. cit. supra at §§ 5911–5922. Even though the primary benefit of the services went to the Local as a whole, the Petitioners are not nevertheless barred merely because they personally will receive some union funds. The case seems to fall in the latter category. It will be recalled that prior to the first suit these Petitioners had been rather harshly treated. The first suit restored fair and orderly procedures to union trials. The Local was undoubtedly gratified at this result, as well they might have been. The suit restored integrity to the internal democratic processes of the Local. Is this not a benefit to the Union? It is true that these Petitioners received some benefit from those fair trials, but the membership as a whole must be deemed to have received the primary benefit. The fact that these Petitioners will get some reimbursement for their own expenditures must be described as merely an incidental benefit to them.

The analogy so far is informative only. At 13 Fletcher, op. cit. supra, at § 6045, the matter of allowance of counsel fees in a derivative suit is discussed. The general rule is said to be that if the plaintiff is successful and the benefit goes to the corporation, then he is entitled to reasonable attorney's fees. At p. 681 of the previous volume it is said:

"The liberal allowance of counsel fees to the rights of a group is the dynamic factor giving the necessary impetus and incentive to the volunteer method of representation in class and derivative suits."

An earlier case in this state supporting the general rule is In re E. C. Warner, 232 Minn. 207, 45 N.W.2d 388, 391 (1950). A more recent case containing a fuller discussion of the point is Bosch v. Meeker Coop. Light & Power Ass'n, 257 Minn. 362, 101 N.W.2d 423 (1960), noted in 48 Calif.L.Rev. 843 (1960). In speaking of the allowance of counsel fees following a successful derivative suit, the Minnesota Supreme Court said, 101 N.W.2d at 426:

"Such actions may have a wholesome effect on the corporate management in keeping it within the limits of its legal responsibility and at the same time act as a deterrent to arbitrary, unreasonable, and harmful managerial conduct. *Where an action by a stockholder results in a substantial benefit to a corporation he should recover his costs and expenses.*" (Emphasis supplied.)

Is this the type of rule envisioned by Lincoln Mills? Does the above state rule embody a helpful solution to this case; will it best effectuate the policy manifested in § 501 of the L.M.R.D.A.? The answer seems clearly in the affirmative. Local 386 thought they received enough benefit to award these Petitioners sub-

stantial attorneys' fees. This Court agrees. The benefit was substantial and the fees were reasonable. The allowance of attorneys' fees in the context of stockholder derivative suits seems to strengthen similar relief here.

It has been argued strongly here that this case should be left to the state courts. Considerable reliance in this regard has been placed on the Bosch case supra. The Respondents have argued that if the Petitioners can show that their Union benefited from the first federal suit, then the state courts will be free to award the attorneys' fees. It seems important to consider the relationship between the rule of the Bosch case and the facts of this one. Bosch held that attorneys' fees could be awarded to successful plaintiffs in stockholder derivative suits where benefit had been conferred on the corporation. The benefit in this case, if any, was that rights created by Congress were protected in the first suit and their assertion was encouraged by the award of attorneys' fees. A federal court seems to be a more appropriate forum for making decisions about such matters. It is likely that this factor alone would not confer federal jurisdiction upon this Court, but this case is not one in which jurisdiction is in doubt and so there is no need to ponder the question.

## XII. ENCOURAGEMENT OF THE ASSERTION OF RIGHTS CONFERRED BY THE L.M.R.D.A.

The rationale can be concluded by referring to the words of an eminent commentator, Cox, Law and the National Labor Policy 105–106 (1960):

"Viewed as a whole, the L.M.R.D.A. relies primarily upon individual employees to enforce the duties of union officials. * * * [T]here is the danger, often expressed in the past, that suits by individual employees are neither an effective sanction nor a practical remedy. Workers are unfamiliar with the law and hesitate to become involved in legal proceedings. The cost is likely to be heavy, and they have little money with which to post bonds, pay lawyers' fees, and print voluminous records. Time is always on the side of the defendant. Even if the suit is successful, there are relatively few situations in which the plaintiff or his attorney can reap financial advantage. Most men are reluctant to incur financial cost in order to vindicate intangible rights. Individual workers who sue union officers run enormous risks, for there are many ways, legal as well as illegal, by which entrenched officials can "take care of" recalcitrant members."

This Court can do no more than join in these well-spoken words.[68] These eight painters, men of modest means, were persecuted and they fought back. They incurred heavy financial costs to vindicate intangible rights belonging to themselves and others. There was no financial advantage to be reaped—only risks to be run. The others, members of Local 386, showed their appreciation of the benefits conferred by awarding the Petitioners their attorneys' fees. The assertion of these rights was thereby encouraged. This Court feels that those fees, as well as the other incidental relief prayed for in this suit, should go to the Petitioners. "The effectiveness of the [L.M.R.D.A.] will depend largely upon the initiative and energy of union members." Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich.L.Rev. 819, 852 (1960). This Court is not going to dampen the commendable initiative and energy displayed here. To quote Prof. Cox for the last time, supra, at 853:

"Only two reported decisions involve suits for an accounting for alleged breach of an agent's fiduciary obligations. Despite all the publicity, the large sums at stake, and the evidence developed by the McClellan Commit-

---

68. See also Summers, The Law of Union Discipline; What the Courts Do in Fact, 70 Yale L.J. 175, 220–222 (1960).

tee, there have been few actions against the Becks, Hoffas, Brewsters, and Webers.

"A hundred-fold increase in the volume of litigation [under the L.M.R.D.A.] would not harm the labor movement. One of the proper costs of coming of age is the risk of unjustified litigation; the risk of unwarranted suits is the price we pay for assurance that very man will have his day in court."

Counsel for both parties have been of invaluable assistance to the Court. It is not likely, however, that Petitioners' counsel foresaw total remuneration for his efforts when the eight Petitioner painters walked into his office. Such men have been well described in Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L.J. 175, 222 (1960):

> "The extent to which individuals and small groups have been able to enforce their rights is a tribute to those lawyers who, fired by a sense of injustice, have contributed unlimited time and energy with no anticipation of even meagre compensation. The burden falls heavily on the lawyer who fulfills his professional responsibility, but even that sacrifice is often inadequate."

With an additional word of gratitude to two scholars [69] whose unknowing assistance has been invaluable, this opinion is concluded. It is admittedly too long. However, it has been intentionally prolix in an effort to resolve all the doubts and uncertainties which have plagued this litigation.

Counsel for Petitioners will submit a proposed Order for Judgment.

---

69. Archibald Cox was formerly Royall Professor of Law at the Harvard Law School. He is a distinguished authority on labor law and has published many articles on the subject. He served as Chairman of the Advisory Panel on Labor-Management Relations Law to the Senate Committee on Labor and Public Welfare. He was the principal advisor to Senator John F. Kennedy of Massachusetts in drafting the Kennedy bill, one of the main antecedents of the L.M.R.D.A. He was appointed Solicitor-General by President Kennedy in 1961.

Clyde W. Summers is presently Professor of Law at Yale University. He specializes in labor law and has been particularly interested in the internal affairs of unions and the rights of union members.

He has been writing in this field for more than fifteen years. In 1953 he wrote the statement of the American Civil Liberties Committee entitled "Democracy in Labor Unions—A Report and Statement of Policy." He was a member of Senator Kennedy's Advisory Committee which helped prepare proposals for legislation in 1957 and 1958. He testified before Senator Kennedy's committee in May, 1958. In 1957 he was named as Chairman of the Governor's Committee on Improper Union and Management Practices in New York. That committee recommended legislation defining the fiduciary obligations of union officers and drafted a bill which was ultimately passed in New York in the spring of 1959.